**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**FEB 15 2005**

**PATRICK FISHER**
**Clerk**

PUBLISH

## UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

---

CYNTHIA DUNCAN,

Plaintiff-Appellant,

v.

No. 03-1257

MANAGER, DEPARTMENT OF
SAFETY, CITY AND COUNTY OF
DENVER, and DAVID MICHAUD,
individually,

Defendants-Appellees.

---

### APPEAL FROM THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLORADO
### (D.C. NO. 99 M 1299)

---

Leslie C. Hansen, Leslie C. Hansen, P.C., Littleton, Colorado for the Plaintiff-Appellant.

Janet A. Savage (Cole Finegan, City Attorney, and Sybil R. Kiskin, Assistant City Attorney, on the briefs), Denver City Attorney's Office, Denver, Colorado, for the Defendants-Appellees.

---

Before **TACHA** , **KELLY** , and **McCONNELL** , Circuit Judges.

---

**McCONNELL** , Circuit Judge.

The Plaintiff, Cynthia Duncan, appeals the district court's award of summary judgment to the Manager of Safety of the City and County of Denver ("the City"), and David Michaud, in his former capacity as the Chief of the Denver Police Department. This case arises from Ms. Duncan's allegations of gender-based discrimination during her employment as a police officer with the Denver Police Department ("DPD"). She raises four issues on appeal.

First, she argues that the district court erred in granting summary judgment to the City on the basis that her Title VII hostile work environment claim was time-barred. Title VII requires a plaintiff to file a charge within 300 days of the allegedly discriminatory employment practice. 42 U.S.C. § 2000e-5(e)(1). Ms. Duncan filed a charge of sex discrimination with the Equal Employment Opportunity Commission ("EEOC") on April 14, 1998. Thus, the filing period for her claims began on June 18, 1997. The United States Supreme Court's decision in *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101 (2002), guides our determination whether Ms. Duncan's hostile work environment claim is timely.

Second, she appeals the district court's failure to address her Title VII retaliation claim against the City. Third, she contends that the district court's award of summary judgment to Mr. Michaud on the grounds of qualified immunity was erroneous. Finally, she argues that the district court incorrectly

denied her motion to supplement her complaint with additional retaliation claims. We take jurisdiction pursuant to 28 U.S.C. § 1291 and AFFIRM.

## I. Factual Background

### A. Overview.

Ms. Duncan's career with the Denver police force has spanned a quarter century of remarkable and historic change. She entered the force at a time when it was unusual for women to be police officers, and she endured more than her fair share of abuse, hostility, and discrimination. She persevered without ever resorting to litigation. In the later years, many more women had become police officers. Although problems of sex discrimination did not evaporate, they became less frequent and more subtle, and were more often and more effectively addressed by the Department. But it was not until the late 1990s that Ms. Duncan's patience was exhausted and she took to court.

Ms. Duncan graduated from the Police Academy in 1979 and was assigned to District Four as a patrol officer. She worked in District Four until 1984, when she transferred to District One. In 1989, she became a detective and worked in the Crimes against Property Division of the Theft Bureau. [ *Id.* ] Ms. Duncan transferred to the Assault Bureau in 1991 before moving to Internal Affairs in 1995. [ *Id.* at 535–36] In 1996, she received a promotion to sergeant and returned to District Four. In August 1998, she was assigned to the Police Academy and in

December 1998 was transferred to the Photo Radar Unit in Traffic Operations. Ms. Duncan took medical leave from the DPD in June 1999 and has not returned to service.

## B. District Four, 1979–84.

Ms. Duncan alleges particularly audacious behavior during her initial assignment to District Four. While she was in training, Ms. Duncan claims that another officer assaulted her as she was leaving work one night by grabbing her and pulling on her clothes. She recalls that when she reported this incident to her training officer and to the Internal Affairs Bureau (IAB), she "was basically told to shut up." She also claims that she received anonymous letters from within the department. The author of the letters threatened to rape and kill her before cutting up her body and scattering the pieces around the city. Ms. Duncan also alleges that a fellow officer exposed himself to her and when she registered her disgust with the officer, he began spreading rumors that he was sleeping with her. While investigating a burglary in a dark basement, she claims her backup officer grabbed her and tried to kiss her. Ms. Duncan claims that her patrol partners would often attempt to grope her by placing their hands palm up on her car seat as she was about sit down.

In addition to these specific incidents, Ms. Duncan claims that she was subjected to constant rumors and sexual banter during her assignment to District

Four.  For example, after officers finished their shifts they would drink beer in the parking lot before going home, an activity jokingly referred to as "choir practice."  Ms. Duncan claims that she generally avoided choir practice, and consequently officers would accuse her of having an affair with any male officer who also happened to miss choir practice.  She alleges that male officers constantly discussed their sex lives and ceaselessly commented on the bodies of women they saw on the street.  According to her testimony, a persistent rumor circulated that she had sex with her sergeant on the captain's desk.

Ms. Duncan claims that her captain at District Four harbored particular animus towards female police officers.  She alleges that when her sergeant recommended her for a promotion the captain asked whether Duncan was "giving him head."  When other sergeants joined in the recommendation, the captain asked if they were all receiving sexual favors from Ms. Duncan.  She alleges that her captain subjected her performance to exacting scrutiny by showing up unannounced while she was on patrol—a behavior she characterizes as "highly unusual."  She recalls that her captain would make remarks about her breasts. The acrimonious relationship between Ms. Duncan and her captain prompted her transfer to District One in 1984.

## C. District One, 1984–89.

Ms. Duncan claims that the discriminatory conduct continued during her assignment to District One. She alleges that while processing an arrest at police headquarters in a dark room, a male detective grabbed her and attempted to kiss her. Ms. Duncan recalls that she tried to make light of the situation because she feared that if she reported it she would have trouble getting cover from other officers during dangerous situations. She claims that during her time at District One male officers ostracized her and refused to partner with her. Consequently, Ms. Duncan often worked by herself and did not receive cover from fellow officers except during urgent situations.

## D. Crimes Against Property, 1989–91.

In 1989, Ms. Duncan was promoted to detective and received a transfer to the Crimes Against Property Division of the Theft Bureau. During this period of her career, Ms. Duncan claims that she was again subjected to rumors about having sexual relationships with fellow officers. She also alleges that while she was in a small room doing paperwork, another detective grabbed her and attempted to kiss her. She did not report the incident and the detective apologized. Ms. Duncan also reports that a fellow detective would leave suggestive notes on her desk, although the behavior ceased after she confronted him. Ms. Duncan claims that she requested a transfer from Crimes against

Property to Burglaries, but the sergeant in charge of Burglaries refused because she was a woman.

## E. Crimes Against Persons, 1991–95.

In 1991, Ms. Duncan moved to the Crimes Against Persons division of the Theft Bureau, where she served until 1995. While in this division, Ms. Duncan alleges that a lieutenant regularly made forward comments and engaged in unwanted physical contact. After Ms. Duncan pointedly complained about his behavior, the comments stopped and the lieutenant apologized. Ms. Duncan also claims that a subordinate officer slapped her on the buttocks so hard that it left a bruise. She filed a complaint with the Internal Affairs Bureau, but the investigation did not lead to any penalties because Ms. Duncan would not allow pictures of the bruise to be taken out of fear that they would be circulated in the department. In addition, Ms. Duncan claims that she was again the subject of rumors, including a story that she had sex with a Deputy Chief on his desk.

## F. Internal Affairs, 1995–96.

In 1995, Ms. Duncan received a transfer to Internal Affairs. While she was in Internal Affairs, Ms. Duncan claims that other officers reported that they saw a superior touching Duncan's breasts on surveillance video. Ms. Duncan asserts that these reports were the basis of a false rumor that circulated around the department. While she was in Internal Affairs, Chief Michaud received an

anonymous letter detailing charges of impropriety; the author threatened to send an even more graphic letter to Duncan's home in an effort to spur Duncan's husband to kill her and the Chief. She reported this incident to IAB.

During this time there was also a dispute concerning Ms. Duncan's performance evaluations. Ms. Duncan believed that her composite ranking on the list for promotion to sergeant reflected an error in tallying her performance evaluations. She requested a correction of her score to reflect the mistakes. The Civil Service Commission increased her rank on the Sergeant Eligibility Register from #28 to #27 after Duncan's commander increased her efficiency rating. Chief Michaud then objected to the change because too much time had passed between the original evaluation and the correction. The Civil Service Commission adopted Chief Michaud's recommendation and reversed the correction. The change ended up meaning little because Ms. Duncan would have been promoted to sergeant at the same time as the officer ranked #27.

## G. District Four, 1996–1998.

After receiving her promotion to sergeant, the Department transferred Ms. Duncan back to District Four in 1996, where she remained until August 1998. Ms. Duncan's second assignment to District Four extended into the filing period, which ran from June 17, 1997 to April 14, 1998. Before her return to District Four as a sergeant, Ms. Duncan alleges that rumors circulated around the district

about her having sex with superiors. She heard that Lt. Leone bragged that he was going to follow Ms. Duncan and some of the superiors that were the subject of rumors in an effort to catch them in compromising positions. Ms. Duncan's husband testified in his deposition that he reported seeing Lt. Leone driving slowly by their home. Ms. Duncan heard that Lt. Leone continually used the term "Cindygate" to describe these rumors. She complained to IAB about Lt. Leone's role in propagating rumors, and the subsequent investigation determined that the charge was unfounded. Another lieutenant repeatedly used the term "woolies" to refer to female genitalia during a work-related conversation with Ms. Duncan in February 1997. She filed a complaint against him with IAB for using this term, and the lieutenant received a written reprimand and was ordered to attend a Remedial Sexual Harassment Class.

Ms. Duncan claims that Sgt. Jeffery Andrews regularly discussed her sex life in front of other command officers over a two-year period. Ms. Duncan claims that Sgt. Andrews attempted, on many occasions, to engage her in sexual banter. He asked her if she engaged in oral sex and speculated that she could "jump start a Harley without a kickstand," apparently in reference to oral sex. He also undermined her authority by second-guessing her and reprimanding her in front of officers under her command. Similarly, he would openly question her competence and allegedly walked out of her roll calls. Ms. Duncan claims that

officers curried favor with this sergeant by ostracizing her. Lt. Bown explained this behavior by saying that Sgt. Andrews "just hates women." Aplt.App. Vol. II 719. IAB conducted an investigation of Sgt. Andrews, and on November 6, 1998, the DPD suspended Sgt. Andrews for 90 days without pay and required him to take a Remedial Sexual Harassment class. In a September 22, 2000 decision on appeal, the Civil Service Commission reduced the suspension to 60 days.

Sometime after May 23, 1997, someone circulated an anonymous screed addressed to the mayor and signed "Concerned Officers," making a series of salacious allegations about various officers. Among other things, the letter alleged that Ms. Duncan had been sleeping with a deputy chief since 1980 and that she received promotions because of this relationship. The letter also alleged that Ms. Duncan was sleeping with a second deputy chief. Ms. Duncan argues that this letter fueled the persistent rumors that she achieved her rank in exchange for sexual favors.

In April 1998, another officer filed an IAB charge against Sgt. Andrews on Ms. Duncan's behalf. Ms. Duncan alleges that fellow officers ostracized her for filing the complaint. A lieutenant remarked that if she were in Vietnam, she would be "fragged" by now, meaning that her fellow soldiers would have killed her. She complains that it was difficult to get cover after she filed the complaint.

She recounts two incidents where she was called to potentially violent situations and did not receive prompt cover from fellow officers.

Sometime in the summer of 1998, Ms. Duncan received what she characterizes as a sexually explicit article in her department mailbox. Her lieutenant did not consider the magazine article to be sexual harassment and made no effort to determine the perpetrator. Ms. Duncan also claims that after her work product was repeatedly taken from her desk, she had to resort to taking her work home on computer disk. During July 1998, she had a large notebook full of paperwork for the lieutenant's exam stolen out of her car. A citizen returned the notebook, explaining that he found it in the nearby city of Lakewood.

By August 1998, the relationship between Ms. Duncan and her colleagues was so acrimonious that Chief Michaud transferred Ms. Duncan out of District Four to a position in the Police Academy out of concern for her safety. In December 1998, she moved to the photo radar unit of traffic operations. In a letter circulated during or after March 1999, an anonymous person accused Ms. Duncan of using sexual relationships with superiors to influence personnel placement decisions. During June 1999, a subordinate officer, while on duty, commented that Ms. Duncan slept around the department. Ms. Duncan filed an IAB complaint, as did the officer, who claimed that she used profanity in responding to him. Both received written reprimands.

### H. The Lawsuit and the Request to Supplement the Complaint.

Ms. Duncan filed her EEOC claim on April 14, 1998. She filed her initial complaint in district court on July 8, 1999, asserting claims against the City, Chief Michaud, and Sgt. Jeffery Andrews. She filed a Motion to Supplement the Complaint and a Supplemental Complaint on February 7, 2001. The Supplemental Complaint contained 11 additional paragraphs alleging improprieties by an assistant city attorney in an attempt to obstruct Ms. Duncan's request for medical leave. The district court construed the motion as an attempt to introduce evidence of attorney conduct rather than a request for new relief. The court denied the motion, concluding that any probative value of the evidence of misconduct by attorneys for the City was outweighed by the possibility that the evidence could prejudice a fact finder. On December 13, 2001, the district court dismissed Sgt. Andrews from the case pursuant to a settlement agreement. On May 6, 2003, the district court granted summary judgment to the remaining parties on all counts.

## II. Analysis

### A. Summary Judgment on Ms. Duncan's Hostile Work Environment Claim.

Title VII requires a litigant to file a claim within 300 days of the alleged discriminatory conduct. 42 U.S.C. § 2000e-5(e)(1). The very precision of this requirement—not a year, not six months, not the state law statute of limitations

for comparable causes of action—bespeaks Congress's concern. Title VII is not intended to allow employees to dredge up old grievances; they must promptly report and take action on discriminatory acts when they occur. Unlitigated bygones are bygones.

As applied to hostile environment claims, however, this requirement has proven problematic. Such claims do not consist primarily of discrete acts, but often involve a series of incidents that span a period longer than 300 days. The Supreme Court addressed this problem in *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002), holding that as long as "an act" contributing to a hostile work environment took place no more than 300 days before the plaintiff filed an EEOC charge, a court may consider the complete history of acts comprising that hostile work environment. The Court justified this holding, in part, on the repeated nature of the conduct, which occurs "over a series of days or perhaps years." *Id.* at 115. Even so, however, an employee may not unreasonably delay the filing of a hostile work environment claim. *Morgan* explains that when analyzing a hostile work environment claim spanning longer than 300 days "[a] court's task is to determine whether the acts about which an employee complains are part of the same actionable hostile work environment practice, and if so, whether any act falls within the statutory time period." *Id.* at 120. *Morgan* emphasizes that there must be a relationship between acts alleged after the

beginning of the filing period and the acts alleged before the filing period: "if an act on day 401 had no relation to the acts between days 1-100, or for some other reason, such as certain intervening action by the employer, was no longer part of the same hostile environment claim, then the employee cannot recover for the previous acts, at least not by reference to the day 401 act." *Id*. at 118. *Morgan* holds that a series of alleged events comprises the same hostile environment where "the pre- and post-limitations period incidents involve[d] the same type of employment actions, occurred relatively frequently, and were perpetrated by the same managers." *Id*. at 120 (citation to court below omitted).

The district court granted summary judgment in favor of the defendants, which we review de novo. *Kendrick v. Penske Transportation Servs., Inc.*, 220 F.3d 1220, 1225 (10th Cir. 2000). Our first task on de novo review is to determine if there is a genuine issue whether the acts Ms. Duncan alleges are part of the same hostile work environment. The acts Ms. Duncan alleges as part of the hostile work environment span her entire tenure with the DPD. To determine whether these acts are part of the same hostile work environment, *Morgan* advises looking at the type of these acts, the frequency of the acts, and the perpetrator of the acts. 536 U.S. at 120. Applying this standard, no jury could rationally conclude that the acts Ms. Duncan alleges are part of the same hostile work environment. The acts she alleges early in her career involve frequent instances

-14-

of threatening physical and psychological harassment. The acts during the filing period involve off-color comments and rumor-spreading perpetrated by a completely different set of actors. Moreover, eighteen years separate the initial allegations from the filing period acts. To permit litigation now over these actions, which were taken by different individuals so long ago under different circumstances, would frustrate the Congressional purpose in passing a tight deadline for filing Title VII claims. By any reasonable measure, the acts alleged by Ms. Duncan are not part of the same actionable hostile working environment.

To delimit Ms. Duncan's claim we must define the scope of the alleged hostile work environment. We begin by examining the acts in the filing period and determining what acts outside of the filing period are related by type, frequency, and perpetrator. The entire range of related acts constitutes the hostile work environment underlying Ms. Duncan's claim. We then determine whether this range of acts creates a genuine issue of material fact whether the DPD is liable for the alleged hostile work environment. To show a genuine issue, Ms. Duncan must demonstrate that the acts were sufficient to create a pervasively discriminatory hostile environment, and she must show that the DPD failed to meet the standard of adequate employer response articulated in *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664 (10th Cir. 1998).

Ms. Duncan alleges three groups of acts that plausibly took place during the filing period: (1) the harassing statements by Sgt. Andrews; (2) the spreading of rumors by Lt. Leone; and (3) the anonymous magazine article placed in her box and the theft of a notebook by an unknown perpetrator. The alleged actions of Sgt. Andrews and Lt. Leone began after Ms. Duncan returned to District Four in late 1996 and continued into the filing period. These acts are related by type, frequency, and perpetrator, thus all these acts, including those before the beginning of the filing period, are within the scope of Ms. Duncan's hostile work environment claim.

The alleged hostile actions that occurred before Ms. Duncan returned to District Four, however, are not part of the same hostile work environment as those alleged during the filing period. The acts she alleges immediately prior to her return are an anonymous letter threatening physical violence and Chief Michaud's adjustment of her score on the sergeant's exam. While these acts may have a temporal relation to the behavior of Sgt. Andrews and Lt. Leone, they are of a different character, they took place while Ms. Duncan was on a different assignment, and they were not perpetrated by the same people. Even if we draw all inferences in Ms. Duncan's favor, we do not think a rational jury could conclude that any of the allegations before her return to District Four are part of the same hostile work environment as those acts alleged during the filing period.

*Morgan* specifically provides that the hostile work environment underlying a Title VII claim may include acts taking place after the plaintiff files an EEOC charge if those acts contribute to the same hostile work environment that existed during the filing period. *Morgan*, 536 U.S. at 117; *see also Martinez v. Potter*, 347 F.3d 1208, 1211 (10th Cir. 2003) (distinguishing discrete acts that occur after the EEOC charge is filed, which require separate exhaustion of administrative remedies, from post-filing acts that contribute to a hostile environment). Accordingly, we analyze the following conduct alleged by Ms. Duncan to determine whether the district court's award of summary judgment to the DPD was proper: (1) the actions of Sgt. Andrews; (2) the use of the term "woolies" by a superior; (3) allegations of rumors about her relationships with superiors; and (4) her receipt of the magazine article.

**1. The Actions of Sgt. Andrews.**

Ms. Duncan's most serious allegations involve the conduct of Sgt. Andrews. This behavior began after Ms. Duncan's return to District Four and extended into the filing period; thus these acts are timely pursuant to *Morgan*. Ms. Duncan presents evidence that Sgt. Andrews (1) openly discussed Ms. Duncan's sex life in a public restaurant in the presence of command officers, (2) speculated that she could "jump start a Harley" with her mouth, and (3) undermined her authority by walking out of roll calls and questioning her

competence. Ms. Duncan claims that Lt. Bown explained this conduct by saying that Sgt. Andrews "just hates women." She also makes a more general allegation that officers ostracized her in an attempt to win favor from Sgt. Andrews. These are substantial claims that are sufficient to demonstrate a genuine issue whether a hostile work environment existed. However, in order to maintain a suit against the City, Ms. Duncan must demonstrate the City's failure to adequately respond to her allegations against Sgt. Andrews.

The City asserts that it took prompt and effective action in response to Sgt. Andrews's conduct. An employer is absolved of liability for acts of harassment by its employees if it undertakes remedial and preventative action "reasonably calculated to end the harassment." *Adler*, 144 F.3d at 676 (quoting *Ellison v. Brady*, 924 F.2d 872, 882 (9th Cir. 1991)). If the employer's response ends the harassment by the employee in question, we presume that the remedial action was sufficient. *Id.* Where the response is not effective, we examine the timing of the employee's complaint, the speed of the employer's response, and the gravity of the punishment relative to the alleged harassment. *Id.* Because the parties provide little discussion of the impact of the Department's disciplinary action against Sgt. Andrews, we focus on the speed and gravity of his punishment.

For reasons that she does not explain, Ms. Duncan did not file an IAB complaint against Sgt. Andrews. Instead, Lt. Gehm filed a complaint against Sgt.

-18-

Andrews on her behalf in April 1998. IAB began an investigation into the allegations and, in a letter dated August 25, 1998, concluded that Sgt. Andrews had sexually harassed Ms. Duncan. On October 12, 1998, IAB sent a letter to Sgt. Andrews notifying him that the DPD was contemplating a disciplinary suspension. On November 6, 1998, the DPD ordered Sgt. Andrews suspended for 90 days without pay for his violation of departmental policy. He appealed the suspension, and in an administrative decision issued on September 22, 2000, the Civil Service Commission reduced the suspension to 60 days.

The response of the DPD was both prompt and effective. Ms. Duncan argues that the DPD did not determine a punishment for Sgt. Andrews until two years after he began harassing her. However, the *Adler* standard looks to the timing of the employee's complaint. In Ms. Duncan's case, Lt. Gehm entered the complaint on her behalf in April 1998. The DPD began a prompt investigation that resulted in a substantial penalty for Sgt. Andrews. Most telling, perhaps, is Ms. Duncan's deposition testimony concerning the discipline of Sgt. Andrews:

> Q . . . . It was when the sexual content of the comments became known that the City initiated, through Lt. Gehm, the IAB complaint against Andrews that resulted in—ultimately, would turn into a 60-day suspension; is that right?
> A Yes.
> Q And in that instance they acted appropriately, didn't they?
> A In that instance.

Aplt.App. Vol. II 851.

-19-

Based on this record, and in light of Ms. Duncan's acknowledgment that the City responded appropriately to the complaint, we agree with the district court that there is no genuine issue whether the City is liable for the actions of Sgt. Andrews.

**2. The Offensive Utterances by a Lieutenant.**

Ms. Duncan points to a superior's use of the term "woolies" to refer to female genitalia in February 1997 as evidence of her hostile environment. While this conduct took place before the beginning of the filing period, it occurred during the alleged hostile work environment created by Sgt. Andrews, so we will consider this allegation timely. It is not enough, however, to allege a timely act; to maintain a claim against the City, the plaintiff must demonstrate a genuine issue that the City was negligent in responding to these utterances. In this instance, Ms. Duncan filed an IAB complaint, which resulted in a written reprimand and a requirement that the offending officer attend a Remedial Sexual Harassment class. This action by the City satisfies the *Adler* standard for responding to harassment because the punishment effectively ended this Lieutenant's harassing behavior. *See Adler*, 144 F.3d at 676. Accordingly, Ms. Duncan may not rely on this incident to demonstrate a genuine issue that the City failed to respond to alleged harassment.

**3. Rumors and Anonymous Letters.**

Ms. Duncan also alleges that the City's unwillingness to stem rumors that she slept with superiors to advance her career contributed to a hostile work environment. Ms. Duncan points to three courses of conduct during her time at District Four to support her rumor claims: (1) the distribution of two anonymous letters; (2) the actions of Lt. Leone; and (3) the comments of a subordinate officer.

Neither of the letters creates genuine issue of fact whether the DPD should be liable for failing to respond to a hostile work environment. The first letter, distributed sometime after May 23, 1997, is an outlandish jeremiad that speculates about a number of far-fetched conspiracies involving high-ranking members of the DPD. Perhaps because the letter was not a credible source of information, and because she was not the primary focus of the letter, Ms. Duncan did not file an IAB complaint. We doubt whether the City has an obligation to investigate this act at all because it is very difficult for an employer to identify and punish the perpetrators of anonymous acts. *See Alfano v. Costello*, 294 F.3d 365, 380 (2d Cir. 2002) (rejecting a hostile work environment claim because, among other reasons, the acts with sexual overtones were difficult to remedy because they were largely anonymous).

Even if there were a burden on the City to attempt to identify the author, the letter does not establish discrimination against Ms. Duncan because of her gender. The letter makes a series of salacious allegations about male and female officers in the DPD, stating, for example, that one male officer likes drag queens and another beats his wife. While the letter is spiteful and inflammatory, one would not say that the letter discriminates against these male police officers on the basis of their gender. Similarly, the allegations that Ms. Duncan had relationships with male officers does not single her out for disparate treatment because of her gender. The letter does not establish a genuine issue whether Ms. Duncan endured a discriminatory hostile work environment for which the City should be liable.

An anonymous author distributed a second letter sometime during or after March 1999 (Ms. Duncan does not provide an exact date). While this act took place after Ms. Duncan filed her EEOC charge, the letter has a clear connection to the other acts, such as the distribution of the first anonymous letter, and so we consider this act as part of her timely hostile work environment allegations. *See Morgan*, 536 U.S. at 117. However, the letter, like the other acts she alleges, simply does not establish a genuine issue of fact that the City tolerated an environment hostile to Ms. Duncan's gender. The letter, in terms that are more measured than the first screed, alleges that a sexual relationship between Ms.

Duncan and Chief Michaud allowed her to influence personnel decisions. Sometime in the summer of 1998, Chief Michaud announced at a roll call that he was not having an affair with Ms. Duncan. A public discrediting of the substance of the letter by the leader of the DPD demonstrates that the City took prompt action to combat the influence of these letters. Even without this response, we doubt whether this letter could support a claim for discriminatory hostile work environment. The letter critiques both Ms. Duncan and Chief Michaud for the alleged affair rather than singling out Ms. Duncan on the basis of her gender. *See Pasqua v. Metro. Life Ins. Co.*, 101 F.3d 514, 517 (7th Cir.1996) (rejecting rumors as evidence of a hostile work environment claim because the defendant failed to show that the employees who spread rumors did so because of the plaintiff's gender). Accordingly, we conclude that there is no genuine issue whether this letter furthers Ms. Duncan's attempt to demonstrate a hostile work environment.

Ms. Duncan also alleges that while she was at District Four, Lt. Leone propagated rumors about her relationships with superiors. We again emphasize that to raise a genuine issue of fact regarding the City's liability for the actions by Lt. Leone, Ms. Duncan must show that the City failed to meet the *Adler* standard for responding to a hostile work environment. While Ms. Duncan does not specifically argue that the City failed to react adequately to the allegations about

Lt. Leone, a review of the City's response to her IAB complaint demonstrates that the City acted in a reasonable manner.

The IAB report reflects interviews with at least eight officers, including Chief Michaud. None of these officers corroborated Ms. Duncan's allegations that Lt. Leone was spreading rumors about her. Accordingly, the IAB report concluded that the charges were unfounded. An employer must respond to a hostile work environment when the employer actually knows, or "in the exercise of reasonable care should have known," of the alleged harassment. *Adler*, 144 F.3d at 673. Here, the City conducted a thorough investigation into Ms. Duncan's allegations. Even if Ms. Duncan's allegations were true, we cannot say the City failed to exercise due diligence in responding to her IAB complaint. Ms. Duncan has not demonstrated a genuine issue whether the City should be liable for the alleged actions of Lt. Leone.

Ms. Duncan also points to inappropriate remarks, based on alleged rumors made by a subordinate officer in June 1999. There is a real question whether we may properly consider this act as part of the same hostile environment that was present during the filing period. By June 1999, Ms. Duncan was no longer in District Four, and more than a year had passed since she filed her EEOC charge. Furthermore, the perpetrator was not associated with the individuals responsible for the environment in District Four. Nevertheless, those difficulties need not

detain us. Granting the generous assumption that this act was part of the same hostile work environment, Ms. Duncan, yet again, fails to show a genuine issue whether the City failed to adequately respond. Ms. Duncan filed an IAB complaint, alleging that the subordinate officer made unsuitable comments. The subsequent investigation found that the officer had acted inappropriately and that Ms. Duncan had violated departmental policy by swearing at the officer in response to his comments. Both the officer and Ms. Duncan received written reprimands, and Ms. Duncan alleges no further action by the officer. There is no requirement that the City muzzle its employees before they make an offensive statement; rather, the burden placed on the City is to penalize harassing actions by its employees in a prompt and effective manner. The City met that burden here.

**4. The Anonymous Magazine Article and the Theft of the Notebook.**

Ms. Duncan alleges that someone placed a sexually explicit magazine article in her mailbox during the filing period. Ms. Duncan cannot demonstrate that gender bias motivated this act. Given Ms. Duncan's lurid description of the article, one might guess that it was in a magazine sold under the counter to men with minds in the gutter. In fact, the article is a mildly tawdry piece chronicling nine reasons why men should be jealous of women. The article appeared in *Glamour* , a magazine marketed to women and sold in supermarkets among tabloids and breath mints. Ms. Duncan does not know who placed the article in

her mailbox, and the record does not indicate whether it was given only to Ms. Duncan or circulated among a number of employees. While giving the article to Ms. Duncan might have been boorish, Title VII provides no remedy for bad taste. *See, e.g.*, *Sprague v. Thorn Americas, Inc.*, 129 F.3d 1355, 1366 (10th Cir. 1997) (holding that unpleasant and offensive conduct does not necessarily create a hostile work environment). Furthermore, Ms. Duncan registered a complaint about this behavior, but her supervisor reasonably concluded that it was insufficient to demonstrate sexual harassment. There is no genuine issue of fact whether the magazine article contributed to a hostile working environment.

Ms. Duncan alleges another anonymous act that shows no indication of being motivated by gender bias—the theft of a job notebook, which was later returned by a man who found it in Lakewood, a Denver suburb. This issue does not warrant protracted discussion because there is no evidence that this act was motivated by hostility to Ms. Duncan's gender.

Because none of the timely acts Ms. Duncan alleges, viewed individually or as a whole, create a genuine issue whether the DPD should be liable for a hostile work environment, summary judgment was properly granted. No matter how severe the discriminatory atmosphere of the DPD over the course of her career, Ms. Duncan cannot now bring suit without presenting evidence of discriminatory acts within the filing period, or arising as part of the same course of

discriminatory conduct as that within the filing period, for which the City should be liable.

## B.  Ms. Duncan's Retaliation Claim.

In her EEOC charge filed on April 14, 1998, Ms. Duncan checked the box alleging that she was subject to retaliation.  She alleges a series of acts before this date that were supposedly in retaliation for her use of the IAB complaint process.  These acts include the failure to receive backup, an angry outburst by a lieutenant during an IAB investigation, and her general ostracization by other officers.  In order to succeed on a claim of retaliation a plaintiff must show: (1) she engaged in protected activity; (2) she suffered an adverse employment action; and (3) there was a causal connection between the protected activity and the adverse action.  *O'Neal v. Ferguson Constr. Co.*, 237 F.3d 1248, 1252 (10th Cir. 2001).  The second prong of this test poses problems for Ms. Duncan.  An adverse employment action "must be materially adverse to the employee's job status. . . .  The adverse action must amount to a significant change in employment status, such as firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."  *Meiners v. University of Kansas*, 359 F.3d 1222, 1230 (10th Cir. 2004) (internal quotations and citations omitted).  None of the actions alleged by Ms. Duncan before April 14, 1998 materially affected her employment status.  These acts may have made

her work environment unpleasant, but they are insufficient to support a retaliation claim.

Ms. Duncan does allege one act that is severe enough to be an adverse action. She alleges that in August 1998, she was transferred to the police academy in retaliation for filing her original EEOC charge. Ms. Duncan did not file an additional EEOC charge alleging the retaliatory act however, and this failure to exhaust her administrative remedies is fatal to her claim. A claim of retaliation is a distinct allegation of an unlawful employment practice. A Title VII plaintiff must "exhaust administrative remedies for each individual discriminatory or retaliatory act." *Martinez v. Potter*, 347 F.3d 1208, 1211 (10th Cir. 2003). Because Ms. Duncan did not file a separate EEOC charge detailing the one plausibly adverse action by the DPD, her retaliation claim was correctly dismissed.

## C. Summary Judgment in Favor of Chief Michaud.

Ms. Duncan also appeals the grant of summary judgment to Chief Michaud on her claim that he is personally liable for his role in her sexual harassment pursuant to 42 U.S.C. § 1983. Chief Michaud's motion for summary judgment argued that the two-year statute of limitations barred Ms. Duncan's claim against him and alternatively that qualified immunity protected him from liability. On appeal, Ms. Duncan argues that Chief Michaud's decision to transfer her out of

District Four, which occurred within the two-year window, is sufficient to establish that her § 1983 claim is timely. This is the only action taken by Chief Michaud that Ms. Duncan alleges took place within the two-year time period. We determined that Ms. Duncan's retaliation charge was properly dismissed because she failed to exhaust her administrative remedies. Accordingly, she cannot rely on this act to establish a timely § 1983 claim. *See Hill v. Ibarra*, 954 F.2d 1516, 1522 (10th Cir. 1992) ("[A] § 1983 claim premised upon rights created [by Title VII] cannot survive the failure to establish a violation of the latter.") Accordingly, summary judgment to Chief Michaud was proper.

## D. The Motion to Supplement Ms. Duncan's Complaint.

Ms. Duncan appeals the district court's order denying her motion to supplement her complaint. Because Ms. Duncan sought to amend her complaint more than twenty days after effecting service of her initial complaint, she needed leave of the court to supplement her complaint. Fed. R. Civ. P. 15(a). The district court denied the motion to supplement because the "central focus" of Ms. Duncan's additional allegations involved the conduct of the City's counsel during the course of litigation.

We review a denial of a motion to supplement a complaint for abuse of discretion. *Frank v. U.S. West, Inc.*, 3 F.3d 1357, 1365 (10th Cir. 1993). Rule 15 states that leave to amend "shall be freely given when justice so requires." Fed.

R. Civ. P. 15(a). We generally refuse leave to amend only on "a showing of undue delay, undue prejudice to the opposing party, bad faith or dilatory motive, failure to cure deficiencies by amendments previously allowed, or futility of amendment." *Frank*, 3 F.3d at 1365. In the Tenth Circuit, untimeliness alone is an adequate reason to refuse leave to amend. *Id*.

The district court construed the supplemental complaint as an attempt to introduce new evidence because Ms. Duncan did not add any new claims for relief. The district court then determined that the probative value of the evidence was "substantially outweighed" by the possibility of unfair prejudice and confusion, and denied the motion pursuant to Federal Rule of Evidence 403. *Id*. Ms. Duncan does not address the argument that the allegations in the supplemental complaint would not be admissible. Instead, she argues that the district court's decision violated the requirement that a court grant leave to amend "when justice so requires." Fed. R. Civ. P. 15(a). Ms. Duncan points us to no authority suggesting that Rule 15 requires the court to accept a supplemental complaint based on evidence that would not be admissible in court. Denying leave to enter the supplemental complaint was well within the discretion of the district court, and we will not disturb this decision.

### III. Conclusion.

The district court correctly concluded that Ms. Duncan's hostile work environment claim was not timely. Though the court did not address Ms. Duncan's discrete retaliation claim, Ms. Duncan's failure to exhaust her administrative remedies renders this claim untimely as well. Ms. Duncan's inability to survive summary judgment on her Title VII claims necessarily means that her § 1983 claims against Chief Michaud cannot succeed. Accordingly, the district court's grant of summary judgment to Chief Michaud was proper. The district court acted within its discretion in denying Ms. Duncan's motion to supplement her complaint. We AFFIRM the judgment of the district court.