**UNITED STATES COURT OF APPEALS**

**April 4, 2008**

**TENTH CIRCUIT**

TERRY H. FULLWILEY,

      Plaintiff-Appellant,

  v.

UNION PACIFIC
CORPORATION, a Utah
Corporation; and UNION PACIFIC
RAILROAD COMPANY, a
Delaware Corporation,

      Defendants-Appellees,

NATIONAL EMPLOYMENT
LAWYERS' ASSOCIATION,

      Amicus Curiae.

No. 06-4070

(D. Utah)

(D.C. No. 2:04-CV-671-TS)

**ORDER AND JUDGMENT**[*]

Before **HENRY,** Chief Judge**, BALDOCK**, Circuit Judge, and **MARTEN**, District Judge.[**]

---

    [*] This order and judgment is not binding precedent except under the doctrines of law of the case, res judicata and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

    [**]The Honorable J. Thomas Marten, District Judge, United States District Court for the District of Kansas, sitting by designation.

Terry Fullwiley brought suit in the United States District Court for the District of Utah alleging that his employer, Union Pacific Railroad, maintained a racially hostile work environment in violation of 42 U.S. C. § 1981. The district court granted summary judgment in favor of Union Pacific. On appeal, Mr. Fullwiley argues that the district court erred in holding that the Supreme Court's decision in National Railroad Passenger Corp. v. Morgan, 536 U.S. 101, 122 (2002), which held that acts outside the limitations period may be considered in a Title VII hostile environment claim, did not apply to claims asserted under § 1981. In addition, he maintains that the district court impermissibly viewed his alleged incidents of harassment in isolation and ignored material evidence in granting summary judgment. We exercise jurisdiction pursuant to 28 U.S.C. § 1291 and affirm.[1]

---

[1] Mr. Fullwiley has moved to (1) file Appendix volume 6 under seal; and (2) supplement the appendix. Union Pacific has moved to strike exhibits B and C to Mr. Fullwiley's appellate brief.

We grant Mr. Fullwiley's motion to file Appendix volume 6 under seal. However, we deny Mr. Fullwiley's motion to supplement the appendix: "our review of a grant of summary judgment is limited to the record before the trial court at the time it made its ruling," Magnum Foods, Inc. v. Continental Cas. Co., 36 F.3d 1491, 1502 n.12 (10th Cir. 1994).

We also grant Union Pacific motion to strike exhibits B and C to Mr. Fullwiley's appellate brief. These exhibits were also not in the record presented to the trial court.

2

## I.  BACKGROUND

Mr. Fullwiley, an African-American, began working for Union Pacific as a switchman in the Salt Lake Service Unit in 1974.  Two years later, Union Pacific promoted him to an engineer position, operating locomotives from Ogden, Utah, to Green River, Wyoming.  Mr. Fullwiley remains fully employed by Union Pacific.

On July 21, 2004, Mr. Fulwiley filed a complaint in the district court alleging that, over the past twenty-five years, he was subjected to racial harassment by co-employees.  The alleged harassment consisted primarily of vulgar racial epithets, the use of racial stereotypes, and, on occasion, physical and verbal altercations purportedly caused by racial animus.  We initially note that many of Mr. Fullwiley's allegations are not actionable as a matter of law and that, as a result, we need not review them in detail.

### A.  Allegations that Are Not Actionable under § 1981

First, a large number of the allegations concern events which occurred before November 21, 1991, when Congress amended 42 U.S.C. § 1981 to cover hostile environment claims.  See Witt v. Roadway Exp., 136 F.3d 1424, 1432 (10th Cir. 1998) (explaining that "The Civil Rights Act of 1991 . . . amended 42 U.S.C. § 1981 to provide a cause of action for racial harassment" and that "[b]ecause the effective date of the amendment was November 21, 1991, we may

3

consider only acts of racial animus <u>after</u> that date to establish [the plaintiff's] §

1981 claim") (emphasis added).

Second, many of Mr. Fullwiley's allegations are based on hearsay

statements of his co-employees (<u>i.e.</u>, statements by co-employees about what a

third employee told them about racial harassment).  <u>See</u> <u>Dick v. Phone Directories</u>

<u>Co.</u>, 397 F.3d 1256, 1266 n.5 (10th Cir. 2005) (concluding that the district court

properly refused to consider hearsay statements of a co-employee offered by the

plaintiff in a hostile environment claim); <u>Noviello v. City of Boston</u>,

398 F.3d 76, 85 (1st Cir. 2005) ("Insofar as the plaintiff is attempting to introduce

[a statement of a coworker] as evidence of <u>other</u> coworkers' harassing behavior, it

is hearsay; its probative value ultimately depends on the truth of the declarant's

own unsworn out-of-court utterance.  It is, therefore, inadmissible.").

Third, some of Mr. Fullwiley's allegations concern alleged racial

harassment of other employees of which Mr. Fullwiley himself was not aware.

Like the pre-November 21, 1991, evidence and the hearsay statements, these

allegations are also not cognizable in a 42 U.S.C. § 1981 action.  <u>See</u> <u>Hirase-Doi</u>

<u>v. U.S. West Commc'ns</u>, 61 F.3d 777, 782 (10th Cir. 1995) (explaining that the

plaintiff  "could not subjectively perceive [her coworker's] behavior towards

others as creating a hostile work environment unless she knew about that

behavior"), <u>abrogated on other grounds by</u> <u>Burlington Indus. v. Ellerth</u>, 524 U.S.

742 (1998) and <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775 (1998).

4

Fourth, Mr. Fullwiley is unable to provide even an approximate date for a few of the alleged incidents of harassment. As a result, we do not consider these allegations either. See Ford v. West, 222 F.3d 767, 777 (10th Cir. 2000) (affirming summary judgment in a Title VII hostile environment case where plaintiff's claims were "vague and conclusory, without reference to specific dates or circumstances").

Finally, in his appellate brief, Mr. Fullwiley advances allegations of harassment that were not made to the district court. We also decline to consider these allegations. See Carpenter v. Boeing Co., 456 F.3d 1183, 1198 n.2 (10th Cir. 2006) ("We will not address the [issue], because our general rule is not to address arguments that were not first presented to the district court. . . . ").

**B. Morgan and the four-year limitations period for § 1981 claims**

With that evidence excluded, we divide Mr. Fullwiley's allegations into two periods: (a) the period from the amendment of 42 U.S.C. § 1981 to cover hostile environment claims (November 21, 1991) until July 21, 2000; (b) the period from July 21, 2000, until July 21, 2004—the date that Mr. Fullwiley filed his § 1981 complaint in the district court. That division is based upon § 1981's four-year statute of limitations and the Supreme Court's decision in Morgan.

In Morgan, the Court considered a hostile environment claim filed under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-1 *et seq*. The Court held that "consideration of the entire scope of a [Title VII] racially hostile work

5

environment claim, <u>including behavior alleged outside the statutory time period</u>, is permissible for the purposes of assessing liability, so long as an act contributing to that hostile environment takes place within the statutory time period." 536 U.S. at 105 (emphasis added). The Court based its holding on the principle that "the entire hostile work environment encompasses a single unlawful employment practice" and that "[Title VII] does not separate individual acts that are part of the hostile environment claim from the whole for the purpose of timely filing and liability." <u>Id.</u> at 117-18.

The Seventh, Eighth, and Eleventh Circuits have concluded that <u>Morgan</u>'s analysis of the Title VII statute of limitations for hostile environment claims should be applied to § 1981 hostile environment claims as well. <u>See</u> <u>Dandy v. United Parcel Serv., Inc.</u>, 388 F.3d 263, 270 (7th Cir. 2004) (stating that "if a plaintiff alleges 'continuing violations,' which constitute a pattern and practice of discrimination, we may look outside of the relevant time period" and that "[t]his doctrine applies to Title VII as well as § 1981 claims"); <u>Madison v. IBP, Inc.</u>, 330 F.3d 1051, 1061 (8th Cir. 2003) (holding that <u>Morgan</u> applies to § 1981 claims and reasoning that "[b]ecause § 1981 allows for recovery for the same type of employment discrimination as Title VII, we believe that the distinction between discrete acts and hostile work environment claims should have equal effect on the respective recovery periods for the two statutes"); <u>Shields v. Fort James Corp.</u>, 305 F.3d 1280, 1282-83 (11th Cir. 2002) (holding that a § 1981 claim alleging

6

that an employer "has allowed a racially hostile work environment to prosper embodies a single violation of an employee's right to 'the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship' and, therefore, should be reviewed in its entirety if any part of this allegation falls within the statute of limitations period") (quoting 42 U.S.C. § 1981).

In our recent decision in <u>Tademy v. Union Pacific Railroad Corp.</u>, no. 06-4073, 2008 WL 852491 (10th Cir. April 1, 2008) we agreed with those courts, holding that "consideration of the entire scope of a [42 U.S.C. § 1981] racially hostile work environment claim, including behavior alleged outside the statutory time period, is permissible for the purposes of assessing liability, so long as an act contributing to that hostile environment takes place within the statutory time period." <u>Tademy</u>, 2008 WL 852491 at *2 (quoting <u>Morgan</u>, 536 U.S. at 105). Thus, because Mr. Fullwiley has alleged acts of racial harassment within the four-year limitations period (July 21, 2000, to July 21, 2004), we will consider certain allegations of harassment before that period as well. Even so, we conclude that the district court properly granted summary judgment to Union Pacific on Mr. Fullwiley's claim.

## C. Incidents Occurring from November 21, 1991, until July 21, 2000

Drawing all reasonable inferences in his favor, as this procedural posture requires, <u>MacKenzie v. City & County of Denver</u>, 414 F.3d 1266, 1273 (10th Cir.

7

2005), and excluding the five categories of evidence noted above, Mr. Fullwiley alleged the following incidents of harassment during this period:

1. In the early to mid-1990s, a co-employee, Layne Heiner, made several comments to Mr. Fullwiley expressing the view that all African-American men have large penises. For example, when Mr. Fullwiley returned from the bathroom Mr. Heiner asked, "Did you get it wet? . . . . [D]id you get it blue? . . . . Did it drag in the dirt?" Aplt's App. vol. III, at 889. Mr. Fullwiley told Mr. Heiner that he was using racial stereotypes and asked him not to do so. Mr. Fullwiley

did not complain to management about Mr. Heiner's crude remarks. Moreover, Mr. Fullwiley stated in his deposition, Mr. Heiner never said anything offensive to him again.

2. Sometime before 1995, Mr. Fullwiley saw the word "nigger" written on a train. Aplt's App. vol. I, at 202. However, he did not report it. Mr. Fullwiley did not personally observe any graffiti written on bathroom walls. Id. However, a co-employee named Harry Price saw the words "[n]o niggers here, "KKK", "[g]o home, boy[,] and "a circle with an 'N' in it" in the bathroom in the north yard shanty. Aplt's App. vol. III, at 933. He told Mr. Fullwiley that this graffiti had been there for years. Mr. Price added that he had not seen any more graffiti on the bathroom walls since 2002. He further stated that he had reported

8

the graffiti to a manager of yard operations about the time that the lawsuit was filed.

3. Sometime between 1995 and 1997, co-employee Ralph Niau observed manager of yard operations Steve Austin berating Mr. Fullwiley. According to Mr. Niau, Mr. Fullwiley had reported a violation of a company rule and Mr. Austin responded by telling Mr. Fullwiley to "get his . . . black ass . . . [b]ack on the units." Aplt's App. vol. IV, at 1121-22. After Mr. Fullwiley left, Mr. Austin said, "Who does that n[igger] guy think he is?" and called him a "cocksucker" and "a no good motherf***er." Id. at 1122-23. Neither Mr. Fullwiley nor Mr. Niau reported those comments, nor is there any indication in this record that Mr. Niau told Mr. Fullwiley about the additional slurs uttered by Mr. Austin after Mr. Fullwiley left.

4. In April 1999, another co-employee, Ray Peterson put his hands on Mr. Fullwiley's shoulders and "start[ed] squeezing [Mr. Fullwiley], digging [Mr. Peterson's] fingers into this little divot between [Mr. Fullwiley's] collarbone and [his] neck area." Aplt's App. vol. I, at 222. Mr. Fullwiley tried "to shake him off." Id. Mr. Peterson released Mr. Fullwiley and then grabbed him from behind and pinned Mr. Fullwiley's arms to the side of his body. Mr. Fullwiley did not want to be confrontational, and so, when Mr. Peterson released him, he walked out of the shanty where the incident had occurred.

In November 1999, Mr. Fullwiley reported the incident to supervisor Greg Noland. When Mr. Noland asked Mr. Fullwiley if the incident was racially motivated, Mr. Fullwiley said that he hoped not. However, he related a remark that Mr. Peterson had made sometime before the incident. According to Mr. Fullwiley, Mr. Peterson said, "My mother says that anybody can beat a nigger." Aplt's App. vol. IV, at 1228. Additionally, Mr. Fullwiley stated that he heard Mr. Peterson tell another employee that he would get another employee to "kick [an African American coworker's] black ass." Aplt's App. vol. I, at 166.

Union Pacific held a disciplinary hearings for Mr. Peterson (for the alleged assault) and for Mr. Fullwiley (for failing to timely report an injury). At Mr. Peterson's hearing, one witness described Mr. Peterson making a "friendly gesture" toward Mr. Fullwiley. Aplt's App. vol. II, at 686. The superintendent found the evidence insufficient to warrant discipline against Mr. Peterson. In contrast, the superintendent concluded that Mr. Fullwiley had reported the injury late in violation of the company's rules and found that he had committed a level-two infraction.

**B.      Incidents occurring between July 21, 2000, and July 21, 2004**

Drawing all reasonable inferences in favor of Mr. Fullwiley, and excluding the five categories of evidence noted above, Mr. Fullwiley alleged the following incidents of harassment from July 21, 2000, to July 21, 2004:

1.     In December 2000, a co-worker, Darrel Tuhoski, spoke with Mr. Fullwiley regarding his suspicions that Mr. Tuhoski's wife was having an affair with a Union Pacific employee named Terry.  Mr. Tuhoski told Mr. Fullwiley, "If I would have caught you two together I would have killed you."  Aplt's App. vol. I, at 211.  At some point during the exchange, Mr. Fullwiley asked Mr. Tuhoski whether the alleged adulterer was "a black guy."  Id. at 209.  Mr. Fullwiley reported the incident to his manager and to a railroad police officer who investigated the alleged threat.  Union Pacific did not ultimately take any action against Mr. Tuhoski, but Mr. Fullwiley admits "that he had no further problems with Mr. Tuhoski because he died."  Aplt's Br. at 15.

2.     In 2000 or 2001, Mr. Fullwiley and two co-workers were reading a rule book when Mr. Fulwiley disagreed with one of the co-workers, Mr. J. D. Smith, about the meaning of a rule.  Mr. Smith told Mr. Fullwiley, "it doesn't read like that, boy."  Aplt's App. vol. I, at 138.  Mr. Smith's use of the word "boy" offended Mr. Fullwiley.

3.     Around the same time, Mr. Fullwiley was boarding a Union Pacific bus or van from Nevada when a co-worker told him he would have to sit in the back because the front was full.  Everybody on the bus laughed, and Mr. Fullwiley, who believed that the remark was a reference to Jim Crow laws, became upset.

11

4.      Again, during approximately the same time, Mr. Fullwiley was boarding another bus when the driver, who was white, told Mr. Fullwiley that in California "white guys" who were friends with "black guys" used to greet them with the phrase, "How you doing, my main nigger?"  Id. at 284.  Mr. Fullwiley told the bus driver that he was offended, and the bus driver never again referred to Mr. Fullwiley using the epithet.

5.      In 2005, an employee found Mr. Fullwiley sleeping on a train in Ogden, Utah, and woke him by telling Mr. Fullwiley to "[r]ise and shine, Sunshine."  Id. at 282.  Mr. Fullwiley contends that the employee referred to him as "sunshine" "two or three times."  Id. at 283.  The employee made no reference to race, and Mr. Fullwiley never informed the employee that he found the term offensive.  Mr. Fullwiley did not report any of these incidents to Union Pacific management.

6.      In 2002, a Union Pacific employee, Charlie White, gained access to a superintendent's e-mail account and sent out an away message urging a significant number of Union Pacific employees to "keep an eye on the slaves . . . seriously."  Aplt's App. vol. II, at 485.  Union Pacific terminated Mr. White for that conduct.  Mr. Fullwiley claims to have heard about the e-mail around the time it was sent, but he never saw it until his attorneys showed it to him when this litigation was pending in 2004.

7.    In the summer of 2003, Mr. Fullwiley learned that an African-American coworker, Ranee Tademy, found a noose hanging above a clock in the Union Pacific workplace.  Mr. Tademy reported the incident.

### E.  Procedural History

Mr. Fullwiley filed suit against Union Pacific on July 21, 2004, alleging that he had been subjected to a racially hostile work environment in violation of § 1981.  He also sought damages for negligent infliction of emotional distress under the Federal Employers Liability Act (FELA), 45 U.S.C. §§ 51-60, and intentional infliction of emotional distress.  The district court granted Union Pacific's motion for summary judgment on all of  Mr. Fullwiley's claims.  In this appeal, Mr. Fullwiley challenges only the grant of summary judgment on his § 1981 claim.

As to that claim, the district court first concluded that it could consider only the acts of racial harassment alleged by Mr. Fullwiley that occurred within the § 1981 limitations period.  It reasoned that the Supreme Court's decision in Morgan, a Title VII case, was inapplicable to Mr. Fullwiley's § 1981 claim.  The district court also refused to consider hearsay statements concerning the alleged harassment.  See Aplt's App. vol. V at 1843, 1852-53 (stating that "'a third party's description of [a witness'] supposed testimony is not suitable grist for the summary judgment mill'") (quoting Gross v. Burggraf, 53 F.3d 1531, 1541 (10th Cir. 1995)).

13

The court then reviewed the admissible evidence of harassment with the four-year limitations period and concluded that Mr. Fullwiley's allegations did not support his claim that he had been subjected to severe or pervasive harassment because of his race. The court further noted that Mr. Fullwiley had reported only one of the alleged incidents of harassment that occurred within the limitations period and that Union Pacific had taken adequate remedial action. Accordingly, Mr. Fullwiley had also failed to establish that Union Pacific should be held liable for the alleged harassment under the agency principles governing employer liability in hostile environment claims.

## II. DISCUSSION

On appeal, Mr. Fullwiley, along with *amicus curiae*, the National Employment Lawyers Association, contends that the district court mistakenly concluded that Morgan does not apply to § 1981 claims, thereby erroneously excluding pre-July 21, 2000, incidents from his claim. He also contends that the court erred in viewing each incident "in a factual vacuum" and that the district court impermissibly failed to take evidence into consideration by "erroneously concluding they were not racial, that they were inadmissible, or simply ignoring them without explanation." Aplt's Br. at 29. In addition, Mr. Fullwiley maintains that the court drew factual inferences in favor of Union Pacific in contravention of the summary judgment standard.

### A. Standard of Review

14

"We review the district court's grant of summary judgment de novo, applying the same standard as the district court." Butler v. Compton, 482 F.3d 1277, 1278 (10th Cir. 2007). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). We examine the record and all reasonable inferences that might be drawn from it in the light most favorable to the non-moving party. MacKenzie, 414 F.3d at 1273.

## B. The Framework for Analyzing a Hostile Environment Claim

Our review of Mr. Fullwiley's hostile environment claim proceeds in three steps. "Our first task . . . is to determine if there is a genuine issue whether the acts [Mr. Fullwiley] alleges are part of the same hostile work environment." Duncan v. Manager, Dep't of Safety, City & County of Denver, 397 F.3d 1300, 1309 (10th Cir. 2005) (applying Morgan to a hostile environment claim filed under Title VII). We must examine "the type of these acts, the frequency of the acts, and the perpetrator of the acts." Id. The harassment must be "racial or stem[] from racial animus." Witt, 136 F.3d at 1432 (internal quotation marks omitted). And at least one of those acts must have occurred within the limitations period.

15

Second, if we conclude that Mr. Fullwiley's claims are sufficiently related, we must evaluate whether he has presented evidence from which a reasonable jury could conclude that "the harassment was pervasive or severe enough to alter the terms, conditions, or privilege of employment." Bolden v. PRC, Inc., 43 F.3d 545, 551 (10th Cir. 1994).

Third, we consider whether Mr. Fullwiley has presented evidence sufficient to give rise to a reasonable inference that Union Pacific's response to the incidents of which it was apprised was inadequate. See Adler v. Wal-Mart Stores, 144 F.3d 664, 673-76 (10th Cir. 1998).

As to the third inquiry, we note that employers are not automatically liable under Title VII for the conduct of employees that creates a hostile work environment. However, "since the employer ultimately controls the conditions of the work environment[,]" our cases hold that "[a]n employer who condones or tolerates the creation of [a hostile work] environment should be held liable." Lockard v. Pizza Hut, 162 F.3d 1062, 1073-74 (10th Cir. 1998) (internal citations and quotations omitted).

In examining the responsibility of employers, we look to agency principles. Hollins v. Delta Airlines, 238 F.3d 1255, 1258 (10th Cir. 2001). Under our precedent, employers may be held liable for the racially harassing conduct of employees under three theories: "[1] the negligence theory, under which the employer fails to remedy a hostile work environment it knew or should have

16

known about; [2] the actual authority theory, under which an employee harasses another employee within the scope of his employment; or [3] the apparent authority theory, under which the harassing employee acts with apparent authority from the employer." Id. (internal quotation marks omitted). Here, Mr. Fullwiley alleges that Union Pacific was negligent in failing to remedy the alleged harassment.

## C. Union Pacific's Response

In our view, it is a close question whether Mr. Fullwiley has presented evidence sufficient to support the first two of these components: (1) that the acts he alleges are part of the same hostile work environment, and (2) that the harassment was pervasive or severe enough to alter the terms, conditions, or privilege of his employment. However, we need not resolve these questions here. Assuming arguendo that the acts he alleges are part of the same hostile work environment and that Mr. Fullwiley has offered evidence that he was subjected to severe or pervasive harassment, he has failed to offer evidence supporting his contention that the company may be held liable for the alleged harassment under a negligence theory.

"Because an employer is only potentially liable for negligence in remedying and preventing harassment of which it negligently failed to discover, courts must make two inquiries: first into the employer's actual or constructive knowledge of harassment, and second, into the adequacy of the employer's remedial and

17

preventative responses to any actually or constructively known harassment."
Adler, 144 F.3d at 673.

"Actual knowledge will be demonstrable in most cases where the plaintiff has reported harassment to management-level employees." Id. When a management-level employee has not been notified, this court applies what amounts to a "negligence standard: highly pervasive harassment should, in the exercise of reasonable care, be discovered by management-level employees." Id.

If the employer has received actual or constructive notice of a hostile work environment, then the court must determine whether its response was adequate. The test is "whether the remedial and preventative action [is] reasonably calculated to end the harassment." Id. at 676 (internal quotation marks omitted). "A stoppage of harassment shows effectiveness, which in turn evidences such reasonable calculation. However, this is not the sole factor to be considered. Because there is no strict liability and an employer must only respond reasonably, a response may be so calculated even though the perpetrator might persist." Id. A plaintiff who argues that continuing harassment demonstrates the inadequacy of the employer's response must offer evidence of "a nexus between a[n employer's] prior response and later harassment by others. . . . " Id. at 678.

Here, out of the alleged acts of harassment within the limitations period, Mr. Fullwiley reported only one, the confrontation with Mr. Tuhoski. As we have noted, the record does not support Mr. Fullwiley's claim that the incident involved

racial animus.  Moreover, Union Pacific and the railroad police investigated the matter, and apparently determined that Mr. Tuhoski's threat, to the extent that his statement could be construed as one, was not sincere.  Further,  Mr. Fullwiley does not allege to have been the victim of any further racially-charged threats from Mr. Tuhoski or any other employee.

As to the other alleged acts of harassment that are actionable, the record indicates that there were two instances in which Union Pacific was notified: Mr. Fullwiley reported the assault by Mr. Peterson, and Mr. Price reported graffiti on bathroom walls.  However, in neither instance has Mr. Fullwiley offered evidence indicating that Union Pacific's response to the complaints was so inadequate as to render the company liable.

As to Mr. Fullwiley's complaint about Mr. Peterson, Union Pacific did respond.  The company conducted an investigation, held a hearing, and determined that the evidence was not sufficient to support Mr. Fullwiley's allegations.  There is no evidence indicating a nexus between that response and the subsequent harassment alleged by Mr. Fullwiley.  Id.

As to Mr. Price's complaints about the graffiti on the bathrooms walls, we acknowledge that in certain instances a company's failure to respond to such matters may support a hostile environment claim.  See Jackson v. Quanex Corp., 191 F.3d 647, 663-64 (6th Cir. 1999) (discussing the fact that an employer "was slow to eliminate racially offensive graffiti when it learned of it, and made no

19

effort to discover the perpetrators"; noting that, as a result of the employer's failure to respond "the graffiti continued throughout the entire period of time that [the plaintiff] worked [for the employer]"; and concluding that "[t]hese were not actions reasonably calculated to end racially offensive conduct"). However, in this case, Mr. Fullwiley has failed to establish a nexus between the company's response to Mr. Price's complaints and the harassment that he experienced. In particular, Mr. Fullwiley testified that he had never seen graffiti on the bathroom walls and that the only graffiti that he had seen was the word "nigger" written on a train sometime around 1995. This evidence is insufficient to show a nexus between Mr. Price's complaints and the hostile environment alleged by Mr. Fullwiley. See id.

## III. CONCLUSION

We therefore AFFIRM the district court's grant of summary judgment to Union Pacific.

Entered for the Court,


Robert H. Henry
Chief Judge

20