FILED
United States Court of Appeals
Tenth Circuit

April 1, 2008

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

# UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

RANEE TADEMY,

Plaintiff-Appellant,

v.

UNION PACIFIC
CORPORATION, a Utah
corporation, and UNION PACIFIC
RAILROAD COMPANY, a
Delaware corporation,

Defendants-Appellees,

and

NATIONAL EMPLOYMENT
LAWYERS ASSOCIATION, and
EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION,

Amici Curiae.

No. 06-4073

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH, D.C.
No. (D.C. No. 2:04-CV-670-DS)**

---

Erika Birch, Strindberg Scholnick & Chamness, LLC, Salt Lake City, Utah (Laura
I. Scholnick, with her on the briefs), for Plaintiff-Appellant.

Janet Hugie Smith, Ray Quinney & Nebeker P.C., Salt Lake City, Utah (Robert O.
Rice and Frederick R. Thaler, with her on the brief), for Defendants-Appellees.

Elizabeth E. Theran, Attorney (James L. Lee, Deputy General Counsel, Lorraine C. Davis, Acting Associate General Counsel, and Vincent J. Blackwood, Assistant General Counsel, with her on the brief) Equal Employment Opportunity Commission, Washington, D.C., appeared for *Amicus Curiae* Equal Employment Opportunity Commission, in support of Plaintiff-Appellant.

Stephanie Struble, Lohf Shaiman Jacobs Hyman & Feiger PC, Denver, Colorado, Joan M. Bechtold, Law Office of Joan M. Bechtold, LLC, Denver, Colorado, and Terisa E. Chaw, National Employment Lawyers Association, San Francisco, California, filed a brief for *Amicus Curiae* National Employment Lawyers Association, in support of Plaintiff-Appellant.

---

Before **HENRY**, Chief Judge, **BALDOCK**, Circuit Judge, and **MARTEN,** District Judge.[*]

---

**HENRY**, Chief Judge.

---

Ranee Tademy worked for Union Pacific Railroad (Union Pacific) from 1979 until he took disability leave in August of 2003 due to depression and anxiety allegedly caused by racial harassment in the workplace. Mr. Tademy brought suit alleging that Union Pacific maintained a racially hostile work environment in contravention of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and 42 U.S.C. § 1981. The district court granted summary judgment for Union Pacific with respect to all of his claims. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we reverse and remand for proceedings consistent with this opinion.

---

[*] The Honorable J. Thomas Marten, District Judge, United States District Court for the District of Kansas, sitting by designation.

## I. BACKGROUND

In 1986, Mr. Tademy transferred to Union Pacific's Salt Lake City service unit, where he worked as a switchman/brakeman and where the alleged harassment occurred. In considering his allegations, we draw all reasonable inferences in favor of Mr. Tademy, as this procedural posture requires. See Kendrick v Penske Transp. Servs., 220 F.3d 1220, 1225 (10th Cir. 2000).

The events supporting Mr. Tademy's claim began in 1995, when he was working as a foreman and one of his crew members, Shane Marvin, seemed to ignore his radio communications. When Mr. Tademy asked Bud Sadler, a co-worker, if he had any idea why Mr. Marvin was not responding, he told Mr. Tademy that "Shane doesn't like black people." Aplt's App. vol. II, at 329. Mr. Tademy approached Mr. Marvin during a break and asked him if he was ignoring his radio communications because he harbored racial animosity. Mr. Marvin responded by rising out of his chair and approaching Mr. Tademy in a physically threatening manner. Mr. Tademy avoided a physical altercation by walking away and telling the manager of yard operations. Union Pacific never talked to Mr. Marvin about the incident.

In 1996, Mr. Tademy found the word "nigger" etched into his locker. He covered the word with a sticker and reported the graffiti to the yard manager on duty, Scott Wagner. In response, Mr. Wagner mentioned that his daughter dated an African American who played football for the University of Utah. He assured

3

Mr. Tademy, "No matter what anybody says about you, Ranee, you're all right with me." Id. at 187. Union Pacific made no effort to find the culprit.

In 1997, Mr. Tademy found the words "nigger go home" written on his locker. He also discovered two racist cartoons posted on company billboards. One was a crude cartoon drawing of a simian figure with an "Afro" hairstyle labeled "monkey" posted on a company billboard. Mr. Tademy removed the first cartoon himself and reported the second one to a union representative. Id. at 217-218.

In 1998, Mr. Tademy saw the word "nigger" on a restroom wall. He reported it to Manager of Operations Lyndon Raphael, who told him that he had removed it. Id. at 201-02.

In 1999, in Mr. Tademy's presence, Mark Bleckert, a Union Pacific employee, referred to Lyndon Raphael, an African-American Union Pacific manager, as "F***ing Kunta Kinte," id. at 347, presumably an allusion to the character in Alex Haley's ROOTS who was brought from Africa to America as a slave. Mr. Tademy reported the incident to Mr. Raphael and the superintendent, Ted Lewis. Union Pacific did not conduct an investigation and did not discipline Mr. Bleckert.

In 2000, Mr. Tademy discovered the words "nigger swimming pool" with an arrow pointing at the toilet along with a "Sambo" character drawn on a restroom wall. Mr. Tademy again reported the incident to the yard manager, Mr.

4

Raphael, who described it to someone up the Union Pacific chain of command, but Union Pacific merely removed the graffiti without investigation.

On January 29, 2001, Mr. Tademy reported for a shift approximately five minutes late, and David Cagle, another yard manager, asked Mr. Tademy, "What time does this job go to work, boy?" in the presence of at least two other employees. Id. at 295. Mr. Tademy was offended by Mr. Cagle's use of the word "boy," and he reported the incident to his yard manager and called Union Pacific's Equal Employment Opportunity (EEO) hotline. This time, in response to Mr. Tademy's report, Norris Wiseman, Mr. Cagle's supervisor, and Yvonne Method-Walker, Union Pacific's manager of EEO compliance, conducted an investigation. In conjunction with that investigation, Cameron Scott, Union Pacific's superintendent of the Salt Lake City unit, determined that Mr. Cagle should take a 30-day fully paid leave of absence. The company also mandated that he attend a diversity workshop in Omaha, Nebraska, and required Mr. Cagle to conduct EEO sessions at different locations in the company's various units in Salt Lake City.

According to Mr. Tademy, Union Pacific's punishment of Mr. Cagle was so ineffective that it became fodder for company humor. His co-workers joked that, "if you want a paid vacation all you have to do is call Ranee Tademy a boy." Aplt's App. vol. VIII, at 1519. In some instances, Mr. Tademy's decision to report Mr. Cagle's comment became a point of contention between Mr. Tademy and other Union Pacific employees. One Union Pacific manager told Mr.

5

Tademy, "the railroad is watching you because you made that charge against Cagle, and you better watch out because they're watching you." Aplt's App. vol. II, at 311.

In June of 2001, after what Mr. Tademy believed was a lackluster response to the Cagle incident, he filed a charge of discrimination with Utah Antidiscrimination & Labor Division (UALD). In his complaint, Mr. Tademy listed his threatening confrontation with Mr. Marvin, the "nigger" etching on his locker, the "Kunte Kinte" incident, the "nigger swimming pool" and the Sambo graffiti, along with the Cagle incident. In addition, during the course of the Cagle investigation, and after he filed his discrimination claim, Mr. Tademy learned from Mr. Raphael that he had found and erased graffiti reading "hang all niggers and jews" in the bathroom wall of the north shanty. Id. at 190. Mr. Raphael cleaned up the graffiti, but the company never attempted to discover the perpetrator. Mr. Tademy included this incident in his UALD complaint.

In January 2002, while Mr. Tademy's discrimination charge was pending, a Union Pacific employee, Charlie White, hacked into a manager's e-mail account and sent an e-mail from the manager's account to a significant number of Union Pacific employees admonishing them to "Keep an eye on the slaves, seriously." Aplt's App. vol. VII, at 1323. Although Mr. White did not send the e-mail to Mr. Tademy, he saw it when a recipient printed out copies and posted them all over

6

Union Pacific's facilities. Union Pacific investigated the incident and terminated Mr. White. However, the company reinstated Mr. White four to six months later.

After receiving a right-to-sue letter in August of 2002, Mr. Tademy met with Mr. Scott (the superintendent of the Salt Lake City unit) and expressed a desire to avoid litigation "[b]ecause all [he] ever wanted was to be able to continue working without being subject to ongoing harassment." Aplt's App. vol. VIII, at 1518. Ultimately, Mr. Tademy "agreed not to pursue a lawsuit against Union Pacific if the company promised it would incorporate annual EEO training into the mandatory Session B trainings." Id. In addition, Union Pacific promised that it would "do on-going annual EEO training." Id. However, according to the Superintendent of Union Pacific's Salt Lake Service Unit, the company cancelled the training in 2003 for financial reasons.

In 2003, Mr. Tademy was required to undergo random drug testing for three consecutive weeks. Although a white co-worker, Richard Puffer, was tested along with Mr. Tademy on each occasion, Mr. Tademy alleges that these drug tests were conducted in retaliation for his discrimination claim.

Finally, on July 4, 2003, Mr. Tademy entered Union Pacific's south shanty and was immediately struck by what appeared to be a life-size hangman's noose prominently suspended from a large industrial wall clock.[1] The sight of the noose

---

[1] At oral argument, there was some discussion about whether the slip-knot
(continued...)

7

caused Mr. Tademy to become so nauseated that he vomited.  He immediately attempted to notify the yard manager on duty.  When none was available, he worked his shift, found yard manager Mike Simmons, and reported the noose.  He also notified the Union Pacific EEO office as well as his union representative, Blaine Bailey.  Mr. Simmons contacted Mr. Scott, who sent Mark Rowley, a Union Pacific special agent, to investigate.  After Mr. Rowley and a Union Pacific manager viewed the noose and interviewed employees, Jan Erickson, a Union Pacific employee, confessed to placing the rope above the clock, but denied any malicious intent.  Instead, Mr. Erickson explained that he found the rope in the rail yard and placed it over the clock so that he would remember to take it for use on his truck.

After conducting a hearing, Union Pacific terminated Mr. Erickson's employment.  However, Mr. Erickson appealed the decision to a public law board, which ordered his restatement after a year's suspension without pay.  Union Pacific held several town hall meetings to discuss how a hanging noose could violate the EEO policy.  However, the company did not require Mr. Erickson to undergo any EEO training.

_____

[1](...continued)
at issue could be classified as a hangman's noose.  This particular knot has four loops.  Aplt's App. vol. IV, at 712.  To our knowledge, there is no specific number of loops required for a slip-knot to constitute a hangman's noose.  A photograph of the noose is attached to this opinion.

In the fall of 2003, Mr. Tademy was placed on disability retirement after a specialist diagnosed him with major depression, post-traumatic stress disorder, and anxiety disorder. In January 2004, Mr. Tademy filed a second charge of discrimination with the UALD. After receiving his right-to-sue letter, Mr. Tademy filed suit in the United States District Court for the District of Utah under Title VII of the 1964 Civil Rights Act and 42 U.S.C. § 1981. The district court granted summary judgment for Union Pacific, and this appeal followed.

## II. DISCUSSION

We review de novo the district court's grant of summary judgment on Mr. Tademy's Title VII and § 1981 hostile environment claims. Duncan v. Manager, Dep't of Safety, City & County of Denver, 397 F.3d 1300, 1309 (10th Cir. 2005). We address each claim in turn.

### A. TITLE VII

"Title VII of the Civil Rights Act of 1964 makes it 'an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.'" Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993) (quoting 42 U.S.C. § 2000e-2(a)(1)). "The objective of Congress in the enactment of Title VII is plain from the language of the statute. It was to achieve equality of employment opportunities and remove barriers that have operated in the past to favor an identifiable group

9

of white employees over other employees." Griggs v. Duke Power Co., 401 U.S. 424, 429-430 (1971). To that end, Title VII proscribes discriminatory hiring as well as employment practices that permeate the workplace with "discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Harris, 510 U.S. at 21 (internal quotations and citations omitted). Mr. Tademy has charged that Union Pacific maintained a racially hostile work environment in violation of the latter prohibition.

"Although Title VII does not explicitly mention hostile work environment, a victim of a racially hostile work environment may nevertheless bring a cause of action under Title VII." Ford v. West, 222 F.3d 767, 775 (10th Cir. 2000). In this case, because he first filed charges of discrimination with a state agency, Mr. Tademy was required to file a claim with the Equal Employment Opportunity Commission (EEOC) within 300 days of the alleged discriminatory conduct. 42 U.S.C. § 2000e-5(e)(1); Duncan, 397 F.3d at 1308.

In the context of suits based on discrete acts, a court may easily determine whether the plaintiff filed a claim within the limitations period. As the Supreme Court noted in National Railroad Passenger Corp. v. Morgan, 536 U.S. 101, 110 (2002), discrete acts "occur[] on the day that [they] happen[]."

"As applied to hostile environment claims, however, [the 300-day] requirement has proven problematic," Duncan, 397 F.3d at 1308, because "[a]

10

hostile work environment claim is composed of a series of separate acts that collectively constitute one 'unlawful employment practice.'" Morgan, 536 U.S. at 117 (quoting 42 U.S.C. § 2000e-5(e)(1)). "[They] occur[] over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own." Id. at 115.

In Morgan, the Supreme Court applied Title VII's strict 300-day statute of limitations to hostile environment claims. The Court held "that consideration of the entire scope of a hostile work environment claim, including behavior alleged outside the statutory time period, is permissible for the purposes of assessing liability, so long as an act contributing to that hostile environment takes place within the statutory time period." Id. at 105 (emphasis added).

Morgan and this court's decision in Duncan dictate that our review of the district court's grant of summary judgment on a hostile environment claim proceeds in three steps. "Our first task . . . is to determine if there is a genuine issue whether the acts [Mr. Tademy] alleges are part of the same hostile work environment." Duncan, 397 F.3d at 1309. In order to determine whether acts are sufficiently related, "Morgan advises looking at the type of these acts, the frequency of the acts, and the perpetrator of the acts." Id. The harassment must be "racial or stem[] from racial animus." Witt v. Roadway Express, 136 F.3d 1424, 1432 (10th Cir. 1998) (internal quotation marks omitted). And, as we have noted, at least one of those acts must have occurred within 300 days of Mr.

11

Tademy's filing of his EEOC claim. Second, if we conclude that Mr. Tademy's claims are sufficiently related, we must evaluate whether Mr. Tademy has presented evidence from which a reasonable jury could conclude that "the harassment was pervasive or severe enough to alter the terms, conditions, or privilege of employment." Bolden v. PRC, Inc., 43 F.3d 545, 551 (10th Cir. 1994). Third, we consider whether Mr. Tademy has presented evidence sufficient to give rise to a reasonable inference that Union Pacific's response to the incidents of which it was apprised was inadequate. See Adler v. Wal-Mart Stores, 144 F.3d 664, 673-76 (10th Cir. 1998).

As to the third inquiry, we note that employers are not automatically liable under Title VII for the conduct of employees that creates a hostile work environment. However, "since the employer ultimately controls the conditions of the work environment[,]" our cases hold that "[a]n employer who condones or tolerates the creation of [a hostile work] environment should be held liable." Lockard v. Pizza Hut, 162 F.3d 1062, 1073-74 (10th Cir. 1998) (internal citations and quotations omitted).

In examining the responsibility of employers, we look to agency principles. Hollins v. Delta Airlines, 238 F.3d 1255, 1258 (10th Cir. 2001). Under our precedent, employers may be held liable for the racially harassing conduct of employees under three theories: "[1] the negligence theory, under which the employer fails to remedy a hostile work environment it knew or should have

12

known about; [2] the actual authority theory, under which an employee harasses another employee within the scope of his employment; or [3] the apparent authority theory, under which the harassing employee acts with apparent authority from the employer." Id.

Here, Mr. Tademy has asserted only a negligence theory. Taking all of the hostile environment factors into account along with Union Pacific's response and, again, drawing all reasonable inferences in Mr. Tademy's favor, as we must, we hold that a reasonable jury could find that Mr. Tademy was subjected to a racially hostile work environment in violation of Title VII. We also conclude that there is a triable issue as to whether Union Pacific "condone[d] or tolerate[d] the creation of [the] environment," Lockard, 162 F.3d at 1073, in that it knew or should have known about the alleged harassment and failed to remedy it.

1.    **Acts that are part of the same hostile work environment**

We initiate our inquiry by defining the scope of Mr. Tademy's claim. Duncan, 397 F.3d at 1309. Our task is to determine "if there is a genuine issue whether the acts [Mr. Tademy] alleges are part of the same hostile work environment," id., whether at least one act comprising that environment occurred within Title VII's 300-day statute of limitations, and whether those acts were "racial or stemmed from racial animus." Witt, 136 F.3d at 1432. We begin by examining acts within the filing period and consider whether incidents outside the filing period are sufficiently related to constitute the same employment practice.

13

Id. Writing on behalf of Mr. Tademy, the EEOC filed a brief arguing that the discriminatory acts at issue constituted "a single, actionable hostile work environment." EEOC Br. at 18. We agree.

a. *Events occurring within the limitations period*

Mr. Tademy alleges two incidents of discrimination within Title VII's filing period. Primarily, Mr. Tademy urges us to conclude that there is a triable issue as to whether being subject to three random drug tests was the product of racial animus. He argues that the statistical probability of being tested three times in one month is so low that the testers must have been singling him out because of his race or in retaliation for his allegations of racial hostility. We do not believe Mr. Tademy has presented sufficient evidence to give rise to a reasonable inference that the drug tests were racial in nature. On this point, we agree with the district court, which concluded:

> There is simply no evidence that the random drug tests were racial or stemmed from racial animus. The un-controverted evidence is that random drug testing is required for employees who work in the operation of trains and that those to be tested are selected by computer on the basis of job positions and shift, not on the basis of individual employee identification. It is undisputed that the drug testing impacted [Mr. Tademy] and his white coworker the same.

Aplt's App. vol. IX, at 2086.

Mr. Tademy also contends that the noose incident, which occurred within the 300-day statute of limitations, may serve as the basis of a hostile environment claim. The district court found that the alleged noose could not be evidence of

14

racial discrimination because it was merely "an industrial rope with a slip knot tied in it. " Id. at 2076. In holding that the would-be noose was benign as a matter of law, the court found that "Erickson decided he could use the rope to help his son move and placed the rope on a wall clock near one of the South Shanty doors so that he would not forget it. Erickson[,] who attached no meaning to the rope[,] forgot to take it home." Id.

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits . . . show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(C). As we have noted, a court considering a summary judgment motion must draw all reasonable inferences in favor of the non-moving party. Kendrick, 220 F.3d at 1225. The district court's analysis of the noose incident does not comport with this principle: its version of events is essentially the story that Mr. Erickson told Union Pacific in an effort to save his job. In our view, the record–including Union Pacific's response to the noose incident–reveals ample reasons to enable a reasonable jury to disbelieve Mr. Erickson's story.

Primarily, in his deposition, Mr. Erickson testified that he wanted the rope "because [he] figured [he] could use this rope with my truck to help my sons move their personal belongings, which was coming up in about a week and two days."

15

Aplt's App. vol. IV, at 688-89. Despite this testimony, a jury could conclude that the rope in question was ill-suited for the stated purpose. According to Mr. Erickson, the rope was "four to six feet long" with the noose and perhaps "eight to ten feet" without it. Id. at 689. The photograph of the noose suggests that six feet is a very generous estimate of the rope's length with the noose. In addition, the record reveals no reason why a slip knot – especially one that looked like a noose – would be of any utility to this project. Finally, it is not clear why, out of all the lengths of rope potentially available over the nine days between July 4 and his sons' move, Mr. Erickson would have chosen one that was likely too short and tied in a superfluous knot.

A jury could also find that Mr. Erickson's proffered rationale for placing the rope above the clock was not worthy of belief. Mr. Erickson testified that he initially placed the rope on a desk, but eventually put it on the clock so that he would not forget it. Given that the stated moving project was nine days away, the record reveals no explanation as to why Mr. Erickson felt compelled to take the rope home *that* day. Had he left the rope on the desk or anywhere else that day, he could have simply retrieved it another day. If he was so concerned about remembering the rope, then he could have placed it in his locker, which was in the same shanty.

In sum, we think a jury could find that Mr. Erickson's explanation of the noose incident was not worthy of belief. Indeed, even Union Pacific harbored

16

doubts about the sincerity of Mr. Erickson's story, as evidenced by the fact that the company terminated his employment as a result of the incident. Thus, ironically, the district court seems to have given Mr. Erickson's version of events more credence than Union Pacific. More importantly, a jury could believe that this noose was meant to evoke a hangman's noose and that Mr. Erickson placed it where it was most likely to be seen and where it could have maximum effect: on the wall clock. Although Mr. Erickson's explanation may ultimately prevail, determinations necessary to reach the truth of the matter are not meant for a court ruling on a summary judgment motion. See Stinnet v. Safeway, Inc., 337 F.3d 1213, 1216 (10th Cir. 2003) ("Credibility determinations [and] the weighing of evidence . . . are jury functions, not those of a judge . . . .").

Furthermore, courts have recognized that a noose may constitute part of a hostile environment claim. See Hollins, 238 F.3d at 1256-58 (noting that "several hangman's nooses dangling from the ceiling above [the plaintiff's] work area" coupled with racist jokes, including one about lynching, were sufficient to give rise to an inference of a hostile environment); see also Vance v. S. Bell Tel. & Tel. Co., 863 F.2d 1503, 1511 n.4 (11th Cir. 1989) ("It is hard to imagine an incident of this sort taking place in 1984. The grossness of hanging an object resembling a noose at the work station of a black female is self-evident."), abrogated on other grounds by Harris, 511 U.S. at 21; Vance v. S. Bell Tel. & Tel., 983 F.2d 1573, 1583 (11th Cir. 1993) (Fay, J., dissenting) ("The noose in [the workplace] context

17

is a symbol not just of racial discrimination or of disapproval, but of terror. . . . Not less than the swastika or the Klansman's hood, the noose in this context is intended to arouse fear."); Williams v. New York City Housing Auth., 154 F. Supp. 2d 820, 824 (S.D.N.Y. 2001) ("Indeed, the noose is among the most repugnant of all racist symbols, because it is itself an instrument of violence.").

Like "a slave-masters whip," the image of a noose is "deeply a part of this country's collective consciousness and history, any [further] explanation of how one could infer a racial motive appears quite unnecessary." Johnson v. Potter, 177 F. Supp. 2d 961, 965 (D. Minn. 2001); see also Virginia v. Black, 538 U.S. 343, 388 (2003) (Thomas, J., dissenting) (stating that "[i]n every culture, certain things [both "sacred" and "profane"] acquire meaning well beyond what outsiders can comprehend" and discussing cross burning as an example). In light of the potential implausibilities in Mr. Erickson's story and the fact that a noose is often employed as a racist symbol, we think a reasonable jury could find that Mr. Erickson's hanging of a life-size noose stemmed from racial animus. We now consider which other acts are sufficiently related to constitute the same work environment.

b. *Claims falling outside the limitations period*

Drawing all reasonable inferences in his favor, we conclude that one of the incidents alleged by Mr. Tademy – the 1995 confrontation with Mr. Marvin–cannot be reasonably viewed as part of the same hostile work environment

18

as the hanging of the noose in the south shanty on July 4, 2003. That confrontation was qualitatively different than the other incidents: it did not involve racial epithets at all and there is no indication that Mr. Marvin's conduct contributed in any way to the subsequent acts alleged by Mr. Tademy. Cf. Duncan, 397 F.3d at 1309 (concluding that acts of "threatening physical and psychological harassment" outside the limitations period were not part of the same hostile work environment as conduct within the limitations period involving "off-color comments and rumor-spreading perpetuated by a completely different set of actors").

However, drawing all reasonable inferences in favor of Mr. Tademy, we further conclude that there is genuine issue of fact as to whether the racist graffiti, Mr. Cagle's use of the term "boy," the slaves e-mail, and Mr. Bleckert's reference to "F***ing Kunta Kinte" were part of the same hostile work environment as the hanging of the noose. In our view, a reasonable jury could find that each was calculated to demean or intimidate African-American employees.

The Cagle "boy" incident, for example, underscores why summary judgment was inappropriate. As typically used in everyday English, there is nothing inherently offensive about the word "boy." Nevertheless, it is a term that has been used to demean African-American men, among others, throughout American history. In conversation, a slight difference in emphasis on a particular word or syllable in a sentence can alter its meaning. Here, we are confronted with

19

conflicting testimony about whether the term was used in an offensive way in this particular instance. Union Pacific's decision to send Mr. Cagle to sensitivity training indicates that the company recognized the racial implications of his comment. Given all of the facts of this case, whether Mr. Cagle's comment was racially motivated and what effect it had on Mr. Tademy are judgments of the sort we are not equipped to make as an appellate court reviewing a cold record. Nor were they appropriate for the district court in ruling on a summary judgment motion. See Stinnet, 337 F.3d at 1216. And we believe this assessment applies equally to the "slaves" e-mail and the racist graffiti.

We also believe that the number of incidents in the given timespan is sufficient to constitute a hostile environment. Our precedent reveals no talismanic number of incidents needed to give rise to a hostile discrimination claim. As we will discuss in greater detail below, whether a hostile environment claim is actionable depends not only on the number of incidents, but also on the severity of the incidents. Here, the incidents include highly offensive graffiti and a noose hanging in the south shanty. As we outline below, we think that a jury could find that although Mr. Tademy may not have been subjected to racism on a daily basis, he has presented evidence sufficient to support his hostile environment claim. Considering all of the circumstances, we are persuaded that a reasonable jury could conclude that these incidents constituted the same employment practice.

20

Union Pacific maintains that our court employs a strict "type, frequency, and perpetrator" test to determine whether there is a sufficient nexus between hostile acts. See Aples' Br. at 34-36. It contends that Mr. Tademy may only survive summary judgment if he is able to demonstrate that the same perpetrator committed any two of the incidents.

We disagree with Union Pacific's characterization of our precedent. While it is true that the acts in Duncan and Morgan were related by type, frequency, and perpetrator, neither of these cases held that a plaintiff must always produce evidence of such a relationship in order to survive summary judgment. Indeed, it is telling that Union Pacific is unable to cite language from Morgan for this proposition and references only the words "type, frequency, and perpetrator" from Duncan. Aples' Br. at 34. The entire sentence in Duncan reads, "These acts are related by type, frequency, and perpetrator, thus all these acts, including those before the beginning of the filing period, are within the scope of Ms. Duncan's hostile work environment claim." 397 F.3d at 1309. Notwithstanding Union Pacific's considerable efforts, the Duncan court's observation about the relationship between the acts in that particular case may not be contorted into a per se requirement.

Indeed, the rule Union Pacific champions would have troubling implications. Under Union Pacific's theory, an employer could escape liability for a racially hostile work environment by employing a legion of bigots, each of

21

whom committed but a solitary act of racism. Such a workplace would hardly operate to "achieve equality of employment opportunities." Griggs, 401 U.S. at 430. Furthermore, requiring proof of repeat perpetrators would also provide employers with a reason to avoid conducting thorough investigations aimed at rooting out the culpable party. Here, for example, Mr. Erickson, Mr. Cagle, Mr. Bleckert, Mr. White, or some other employee could have been responsible for any number of the incidents of racist graffiti. However it is impossible to know because Union Pacific failed to investigate the incidents of graffiti or the etchings on Mr. Tademy's locker. By contrast, when the company did conduct an investigation, the perpetrator was discovered. Yet if only repeat offenders could render the company liable for a hostile work environment, the company's failure to investigate the incidents and identify the perpetrator might devolve to its benefit.

In addition, the fact that all of these incidents occurred in the same service unit persuades us that they are sufficiently related at this stage of the case. In Duncan, the incidents of alleged harassment occurred over the course of twenty years while Ms. Duncan was working in various capacities with no fewer than seven departments of the Denver Police. 397 F.3d at 1304. Here, by contrast, all of the acts took place within an eight-year span while Mr. Tademy was working in the same place, the Salt Lake service unit. This fact is significant because it suggests that the same, undiscovered perpetrator could have been responsible for several or even multiple incidents. Moreover, as we will discuss in greater detail

22

below, Union Pacific was, or should have been, on notice of recurrent conduct in the same area.

**2.     Severity or Pervasiveness**

Having determined that Mr. Tademy has demonstrated a triable issue as to whether the incidents constituted the same employment practice, we now assess whether a reasonable jury could conclude that "[Mr. Tademy's] workplace [was] permeated with discriminatory intimidation, ridicule, and insult, that [was] sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive working environment." Herrera v. Lufkin Indus., Inc., 474 F.3d 675, 680 (10th Cir. 2007) (internal quotation marks omitted). We have stated that "[p]ervasiveness and severity are independent and equal grounds" upon which a plaintiff may establish this element of a hostile environment claim. Witt v. Roadway Express, 136 F.3d 1424, 1432 (10th Cir. 1998) (addressing a hostile environment claim under 42 U.S.C. § 1981); see also Aramburu v. Boeing Co., 112 F.3d 1398, 1410 (10th Cir. 1997) (citing Durham v. Xerox Corp., 18 F.3d 836, 838-39 (10th Cir. 1997) for the proposition that "standards and burdens under § 1981 are the same as those under Title VII"). Nevertheless, those two grounds "are, to a certain degree inversely related; a sufficiently severe episode may occur as rarely as once . . . , while a relentless pattern of lesser harassment that extends over a long period of time also violates the statute." Cerros v. Steel Techs, Inc., 288 F.3d 1040, 1047 (7th Cir. 2002).

23

"In making this determination, we consider the work atmosphere both objectively and subjectively, looking at all the circumstances from the perspective of a reasonable person in the plaintiff's position." Herrera, 474 F.3d at 680 (internal quotation marks and alterations omitted). We may consider the conduct's frequency and severity; "whether it is physically threatening or humiliating, or a mere offensive utterance"; and whether it unreasonably interferes with the plaintiff employee's work performance. Harsco Corp. v. Renner, 475 F.3d 1179, 1187 (10th Cir. 2007). The inquiry "is particularly unsuited for summary judgment because it is quintessentially a question of fact." Herrera, 474 F.3d at 680 (internal quotation marks omitted).

Here, Mr. Tademy has alleged a series of acts of harassment, "culminating in the life-sized lynching noose[,]" an incident that affected him so profoundly that he did not return to work at Union Pacific. Aplt's Br. at 43. We view these allegations as asserting severe rather than pervasive harassment. See Smith v. Northwest Financial Acceptance, Inc., 129 F.3d 1408, 1414 (10th Cir. 1998) (concluding that "the cumulative evidence of severity was sufficient for the court to conclude that a reasonable person would find Plaintiff's work environment hostile or abusive'). Considering the evidence in the light most favorable to Mr. Tademy, we conclude that a reasonable jury could find the harassment alleged by Mr. Tademy was "sufficiently severe . . . to alter the conditions of [his] employment and create an abusive working environment." Herrera, 474 F.3d at

24

680 (internal quotation marks omitted); cf. Rodgers v. Western-Southern Life Ins. Co., 12 F.3d 668, 675 (7th Cir. 1993) (considering "the cumulative weight of . . . several 'isolated' racial comments" and concluding that the record supported the finding that the plaintiff employee was subjected to a hostile environment).

In particular, the various graffiti and cartoons combined with the words "nigger" and "nigger go home" etched on Mr. Tademy's locker are the sort of conduct that would make any reasonable person feel uncomfortable–and entirely unwelcome, to say the least–in the workplace. See Spriggs v. Diamond Auto Glass, 242 F.3d 179, 185 (4th Cir. 2001) ("Far more than a mere offensive utterance, the word 'nigger' is pure anathema to African-Americans. Perhaps no single act can more quickly . . . create an abusive working environment than the use of an unambiguously racial epithet such as 'nigger'. . . .") (internal quotation marks omitted). Indeed, it is difficult to imagine a message more calculated to make an African-American feel unwelcome in the workplace than "nigger" engraved in his or her individual workspace. See Cerros, 288 F.3d at 1047 ("While there is no 'magic number' of slurs that indicate a hostile work environment, we have recognized before that an unambiguously racial epithet falls on the 'more severe' end of the spectrum.").

In addition, a jury could easily find that the noose was an egregious act of discrimination calculated to intimidate African-Americans. See Williams, 154 F. Supp. 2d at 825 ("The . . . noose remains a potent and threatening symbol for

25

African-Americans, in part because the grim specter of racially motivated violence continues to manifest itself in present day hate crimes.").  While it is associated with vigilante justice in the American West, and even state-sanctioned capital punishment, Judge Robert Carter, a judge in the Southern District of New York and a leading figure in civil rights law, has observed that

> [i]t is impossible to appreciate the impact of the display of a noose without understanding this nation's opprobrious legacy of violence against African-Americans.  One study notes that from 1882, the earliest date for reliable statistics, to 1968, 3,446 African-Americans died at the hands of lynch mobs.  See ROBERT L. ZANGRANDO, THE NAACP CRUSADE AGAINST LYNCHING, 1909-1950 4 (1980).  Obviously, these figures underestimate the actual number of blacks who were the victims of lynchings because such atrocities were underreported, and southern whites frequently attempted to suppress evidence of mob violence for fear of the enactment of a federal anti-lynching law.  See id.
>
> The effect of such violence on the psyche of African-Americans cannot be exaggerated. Sociologists have explained that "lynching was employed to maintain dominance whenever it suited whites to reaffirm their mastery or blacks challenged or seemed about to test the established contours of their subordination." Id. at 9.

Id. at 824.

In the instant case, Mr. Tademy was so disturbed by the sight of the noose that he became physically ill.  As he recounted, "I was paralyzed kind of . . . . [T]he next thing I remember is my stomach kind of got sick, and the next thing I remember is I was in the restroom throwing up.  And I don't even remember going to the restroom, but I remember being in there . . .  throwing up." Aplt's App. vol. II, at 230.  The noose incident must also be viewed in light of the fact that Mr.

26

Tademy was aware of the "hang all niggers and jews" graffiti, a fact that understandably intensified his reaction. We acknowledge that the placement of the noose may have involved no racist intent at all, as Mr. Erickson maintained. Or perhaps the fact that the act occurred on July 4 was intended to have some particular significance. In any event, while there may be legitimate arguments on both sides, these arguments should take place before a jury that will have the opportunity to evaluate the evidence, demeanor, and candor of witnesses.

Additionally, as we have noted, the term "boy" can be highly offensive when used in certain contexts. And we need not explore America's history of race relations to understand why an African-American would be offended by the "slaves" e-mail or a co-worker's crude comparison of a manager to "F***ing Kunte Kinte." While it is possible that a jury might believe that the slaves e-mail and Mr. Bleckert's remark were not racially motivated, the question of whether they were and, if so, how they would have affected Mr. Tademy's work environment are "particularly unsuited for summary judgment because [they are] quintessentially [] question[s] of fact." Herrera, 474 F.3d at 680.

In addition, in determining whether the hostile environment was sufficiently severe, we consider several other acts that Mr. Tademy has alleged. Cf. Morgan, 536 U.S. at 113 (noting that Title VII "[does not] bar an employee from using the prior acts as background evidence in support of a timely claim"). Thus, we take into account the instances when Mr. Tademy arrived at work to find the words

27

"nigger" and "nigger go home" etched into his locker, as well as the occasions when he saw racist graffiti in company bathrooms and on company billboards. See McGinest v. GTE Serv. Corp., 360 F.3d 1103, 1116 (9th Cir. 2004) (concluding that "the prevalence of graffiti containing a racial slur evocative of lynchings and racial hierarchy [is] [a] significant exacerbating factor[] in evaluating the severity of the racial hostility"); Cerros, 288 F.3d at 1047 ("Adding up all of the derogatory names directed at [the plaintiff] as well as all of the graffiti on the bathroom walls, and coupling that with more information about how frequently or how long the abuse endured, the court might well find that both the pervasiveness and the severity measures are high."). These words and images are, obviously, quite disturbing, and there are few more discomforting messages than "nigger go home" posted on the locker of an African-American. These incidents would have only heightened Mr. Tademy's discomfort in the workplace following the noose incident.

We also note that "evidence of a general work atmosphere, including evidence of harassment of other [racial minorities], may be considered in evaluating a claim," as long as Mr. Tademy presents evidence that he knew about the offending behavior. Hirase-Doi v. U.S. West Commc'ns, Inc., 61 F.3d 777, 782 (10th Cir. 1995). Thus, we also consider the fact that Mr. Tademy was aware of the "hang all niggers and jews" graffiti. A reasonable jury could also rely upon that fact to conclude that Mr. Tademy was subjected to severe harassment.

**3.    Union Pacific's Response**

We now consider whether a reasonable jury could also find Union Pacific liable under Title VII because the company "condone[d] or tolerate[d] the creation of [a racially hostile] environment." Lockard, 162 F.3d at 1073. On this issue, Mr. Tademy advances a negligence theory "under which the employer fails to remedy a hostile work environment it knew or should have known about." Hollins, 238 F.3d at 1258 (internal quotation marks omitted).

Our assessment of Union Pacific's response proceeds in two steps. We begin by taking account of the instances of discrimination that should have reasonably put Union Pacific on notice that the Salt Lake unit had a problem with the types of discrimination Mr. Tademy alleges. We then address the adequacy of the company's response in light of the discrimination about which Union Pacific knew or reasonably should have known.

a.    *Notice*

"Because an employer is only potentially liable for negligence in remedying and preventing harassment of which it negligently failed to discover, courts must make two inquiries: first into the employer's actual or constructive knowledge of harassment, and second, into the adequacy of the employer's remedial and preventative responses to any actually or constructively known harassment." Adler, 144 F.3d at 673. We have held that "[a]ctual knowledge will be demonstrable in most cases where the plaintiff has reported harassment to

29

management-level employees." Id.  When a management-level employee has not been notified, this court applies what amounts to a "negligence standard: highly pervasive harassment should, in the exercise of reasonable care, be discovered by management-level employees." Id.

In this case, the following acts of harassment were reported to Union Pacific's management-level employees:  (1) the word "nigger" written on Mr. Tademy's locker; (2) the work "nigger" written on a restroom wall; (3) the "Sambo" cartoon and the words the "nigger swimming pool" placed on a restroom wall; ( 4) the words "hang all niggers and jews" written in a bathroom; (5) the "F***ing Kunte Kinte" incident, (6) the Cagle "boy" incident, (7) the slaves e-mail, (8) and the Erickson noose incident.  In addition, in evaluating Union Pacific's response to Mr. Tademy's complaints, we must also take into account reports by other employees that should have put the company on notice that discriminatory conduct of the type Mr. Tademy reported.  In determining whether to consider acts alleged by other employees, we look to "[t]he extent and seriousness of the earlier harassment and the similarity and nearness in time to the later harassment . . . ." Hirase-Doi, 61 F.3d at 783-84.

Mr. Tademy presented evidence that a fellow employee, Harry Price, reported numerous instances of racist graffiti to Union Pacific's management.  The messages included ones similar to those Mr. Tademy experienced: "No niggers here," "Go home, boy," "KKK," an "N" with a circle around it and a slash drawn

through it, and a cartoon drawing of a person that, at one time, was labeled "nigger." Aplt's App. vol. VI, at 1008, 1010. According to Mr. Price, part of this graffiti remained in the North Yard shanty bathroom for ten or twelve years, and part of it remained for three or four years. The graffiti was removed sometime in 2002. Id. at 1008. Mr. Price reported this graffiti to three different Union Pacific employees he believed were management-level employees, including a superintendent, and in each case they said they would take care of it, but no investigation was ever conducted.

Mr. Tademy also urges this court to take into account the fact that Union Pacific received complaints about nooses in service units in Albina, Oregon; Seattle, Washington; Chicago, Illinois; and Los Angeles, California, all within four years of Mr. Tademy's discovery of the noose. However, in conducting our inquiry, we decline to take into account any acts of discrimination occurring outside of the Salt Lake unit. As Union Pacific points out, it is a large company with employees scattered across the western and mid-western United States. We fail to see how the appearance of, for example, nooses in four disparate locations would alert the company of a potential problem in the Salt Lake unit. Thus, we do not consider Union Pacific on notice of a noose problem because those incidents occurred at various locations and Mr. Tademy has not alleged that they are related to the noose at issue.

31

Nevertheless, based on the record before us, we must conclude that there is a triable issue as to whether the recurrence of racist graffiti was the sort of harassment that in the exercise of reasonable care should have been discovered by management-level employees. Adler, 144 F.3d at 673. In reaching this conclusion, we consider the accounts of Mr. Price because they describe harassment that is sufficiently related in "similarity and nearness in time" to the racial hostilities Mr. Tademy has alleged. Hirase-Doi, 61 F.3d at 783-84. Thus, for the purposes of our analysis below, we assume that Union Pacific was, or at least should have been, on notice that the Salt Lake service unit had a serious problem with bigoted messages appearing in public spaces around the time Mr. Tademy raised his complaints.

b.     *Adequacy*

The test for the adequacy of an employer's remedial response to racial hostility is "whether the remedial and preventative action [is] reasonably calculated to end the harassment." Adler, 144 F.3d at 676 (internal quotation marks omitted). "A stoppage of harassment shows effectiveness, which in turn evidences such reasonable calculation. However, this is not the sole factor to be considered. Because there is no strict liability and an employer must only respond reasonably, a response may be so calculated even though the perpetrator might persist." Id. A plaintiff who argues that continuing harassment demonstrates the

32

inadequacy of the employer's response must offer evidence of "a nexus between a[n employer's] prior response and later harassment by others." Id. at 678.

If the employer's action does not stop the harassment, then this court examines its adequacy in light of "the timing of the employee's complaint, the speed of the employer's response, and the gravity of the punishment relative to the alleged harassment." Duncan, 397 F.3d at 1310. We view the record in the light most favorable to the non-moving party. See Kendrick, 220 F.3d at 1225.

Here, Mr. Tademy has offered evidence that Union Pacific failed to investigate or discipline any employee as a result of (1) the word "nigger" written on Mr. Tademy's locker; (2) the words "nigger" and "hang all niggers and jews" written in a bathroom; (3) the "F***ing Kunte Kinte" incident, (4) the Sambo cartoon; and (5) the "nigger swimming pool" graffiti. We also take into account the evidence offered by Mr. Price–that Union Pacific was on notice of, but failed to take action regarding, a variety of racist graffiti over an extended period of time.

Those messages were unequivocally racist. The fact that the words "nigger," "nigger go home," and "hang all niggers and jews" appeared, and in some instances remained, in areas accessible to all employees may well reveal more about what is acceptable in the work environment than any EEO manuals, which may or may not be distributed to or read by employees. See Adler, 144 F.3d at 676 (stating that "[c]ourts have explained that simply indicating to a

33

perpetrator the existence of a policy against harassment is usually insufficient" to constitute an effective response). These statements not only communicated to minority employees that were not welcome in the workplace but also sent a message that overt expressions of racism would not be taken seriously. Both of these signals are antithetical to Title VII and contribute to a hostile work environment.

In response to Mr. Tademy's allegations regarding the graffiti, Union Pacific invokes our statement in Duncan that "[w]e doubt whether [the defendant employer] ha[d] an obligation to investigate" the distribution of anonymous letters because "it is very difficult for an employer to identify and punish the perpetrators of anonymous acts." 397 F.3d at 1312. In our view, that statement does not establish as a matter of law that a failure to make any efforts to determine which employees were responsible for multiple incidents of racist graffiti was reasonable. The two anonymous letters at issue in Duncan included "an outlandish jeremiad that speculate[d] about a number of far-fetched conspiracies involving high ranking members of the [Denver Police Department]." Id. Here, in contrast, the graffiti was placed throughout the workplace over an extended period of time and, as we have noted, its presence there supports Mr. Tademy's claim that he was subjected to severe harassment. Although there may be difficulties with investigating anonymous acts of harassment, those difficulties at most present factual questions about the reasonableness of Union Pacific's response; they are

34

not sufficient to support a finding that Union Pacific acted reasonably as a matter of law.

Further, our precedent suggests that employers have remedies available for graffiti in the workplace. For example, in Baty v. Willamette Indus., Inc., 172 F.3d 1232 (10th Cir. 1999), overruled on other grounds by Morgan, 536 U.S.101, an employer received complaints about graffiti containing inappropriate sexual references to a particular female employee in the men's restroom. In response, the employer collected samples of the graffiti and compared them to handwriting on job applications. Similarly, in Scarberry v. ExxonMobil Oil Corp., 328 F.3d 1255, 1257-58 (10th Cir. 2003), the employer's human resources manager (1) personally viewed the graffiti; (2) took pictures of it; (3) authorized the graffiti's immediate removal; (4) began interviewing employees and security guards to determine who could be a suspect; (5) began interviewing employees who had been targeted as suspects; (6) collected writing samples from the suspects' employee records and compared them with the graffiti; (7) reviewed the company's security system surveillance tapes; (8) reviewed trucking logs of outside contractors who were on the premises during the relevant period; (9) attempted to identify a forensic handwriting expert; (10) contacted headquarters seeking additional assistance; and (11) told security to be more aware of potential problems at the plant. In response to a second incident, the employer took similar measures, concluded that it was "highly probable" that a particular employee was responsible, and terminated him.

Id. at 1258. In our view, those measures were reasonably calculated to end the harassment caused by the graffiti.

Here, the reasonableness of Union Pacific's response to the graffiti is also undermined by its own response to the noose incident. The noose, like the graffiti, was "anonymous," Duncan, 397 F.3d at 1312; no employee signed his name to it or volunteered, without investigation, that he or she was responsible for it. Yet, in that instance, Union Pacific management did not conclude that no action could be taken. Instead, the company began an inquiry, identified the responsible employee, and took disciplinary action. On this record, a reasonable jury could conclude that similar efforts were possible with respect to the graffiti. Importantly, a reasonable jury could also find a nexus between the failure to investigate the graffiti and later acts committed by Mr. White and Mr. Erickson (the slaves e-mail and the noose). See Adler, 144 F.3d at 678. Because Union Pacific made no efforts to identify and discipline those responsible for the various incidents of racist graffiti, those two employees might well have concluded that they could engage in such behavior with minimal consequences (i.e., that their employer would "condone[] or tolerate[]" these acts). Lockard, 162 F.3d at 1073. See Jackson v. Quanex, 191 F.3d 647, 663-64 (6th Cir. 1999) (discussing the fact that an employer "was slow to eliminate racially offensive graffiti when it learned of it, and made no effort to discover the perpetrators"; noting that, as a result of the employer's failure to respond "the graffiti continued throughout the entire

36

period of time that [the plaintiff] worked [for the employer]"; and concluding that "[t]hese were not actions reasonably calculated to end racially offensive conduct").

We therefore conclude that there are genuine issues of fact as to whether an apparent racist graffiti problem, combined with Union Pacific's failure to respond to Mr. Tademy's complaints about the Bleckert incident contributed to the subsequent acts of harassment. Mr. Tademy has presented evidence sufficient to give rise to an inference that Union Pacific failed to "discharge its obligation by taking appropriate remedial or preventative action." Adler, 144 F.3d at 676.

**4**.     **Mr. Tademy is not barred from raising claims included in a previous complaint for which he received a right-to-sue letter**

Title VII requires a plaintiff to file a charge of discrimination within 300 days of the alleged discriminatory act. Upon receipt of a right to sue letter, he must file suit within 90 days. In general, plaintiffs may only revive lapsed claims through equitable tolling. Million v. Frank, 47 F.3d 385, 389 (10th Cir. 1995) ("Compliance with the filing requirements of Title VII . . . is a condition precedent to suit that functions like a statute of limitations and is subject to waiver, estoppel, and equitable tolling.").

Union Pacific argues that Mr. Tademy may not include as part of the instant Title VII claim any of the incidents that occurred before August 22, 2002, because he chose not to file suit after receiving his initial right-to-sue letter. Thus,

37

according to Union Pacific's theory, we may not consider the allegedly

discriminatory acts listed on Mr. Tademy's first claim as part of the instant

hostile environment claim.[2]  Union Pacific further argues that Mr. Tademy has

waived any right to contest its position because he failed to address this specific

argument below as well as on appeal.

Like the EEOC, which has filed an amicus brief in this case, we disagree

with Union Pacific's contention that Mr. Tademy has waived the right to contest

this issue on appeal.  Most importantly, the district court did not clearly resolve

the matter.  In its ruling on Union Pacific's motion for summary judgment, the

court noted the general rule that "the 90-day period for filing a civil lawsuit after

final disposition of a complaint by the EEOC is a requirement that, like a statute of

limitations, is subject to waiver, estoppel, and equitable tolling."  Aplt's App. vol.

IX, at 2079 (internal quotation marks omitted).  The court added that  Mr. Tademy

"makes no argument for waiver, estoppel, or equitable tolling and offers only the

desire to work without harassment as the reason why he filed his suit."  Id.

However, the court never stated whether the circumstances of this case warranted

an exception to the 90-day requirement.  Moreover, in determining whether Mr.

_____

[2]  These incidents include the "nigger" etching on Mr. Tademy's locker and the one in the bathroom; the cartoon with a Sambo figure and sign reading "nigger swimming pool" and pointing to the toilet; the "kill all niggers and jews" graffiti in Union Pacific's bathroom; the "F***ing Kunte Kinte"; Mr. Cagle's reference to Mr. Tademy as "boy" in front of his co-workers; and the slaves e-mail.

38

Tademy had been subjected to a hostile work environment, the court proceeded to consider the various incidents that he included in his first EEOC complaint.

Even so, in his opening brief, Mr. Tademy did discuss Union Pacific's argument regarding the 90-day limit. He noted Union Pacific's waiver argument and observed that the court had not ruled on it. He then argued that the authorities invoked by Union Pacific "all involve discrete acts of discrimination or retaliation, not hostile environment claims." Aplt's Br. at 35 n.33.

Accordingly, we reject Union Pacific's argument that Mr. Tademy may not now contest the issue, and we proceed to consider whether we may consider the allegations in his first EEOC complaint as part of his hostile environment claim in this case. This is a purely legal question, and we examine it de novo. Johnson v. City of Tulsa, 489 F.3d 1089, 1102 (10th Cir. 2007). We look to the applicable statute, Morgan, and our own precedent.

Title VII contains no language barring a plaintiff from presenting allegations in support of a hostile environment claim that he had advanced in a prior EEOC complaint but chosen not to litigate within 90 days of a right-to-sue letter. Nor does Morgan provide a foundation for such a rule. Indeed, no Tenth Circuit or Supreme Court precedent indicates that § 2000e-5(f)(1)'s timely filing provision poses such a barrier to litigation of a hostile environment claim. Adopting Union Pacific's rule would, in some respects, undermine Morgan, which enables hostile environment plaintiffs to rely on claims that are otherwise time

39

barred.  See Morgan, 536 U.S. at 117 ("The timely filing provision only requires that a Title VII plaintiff file a charge within a certain number of days after the unlawful practice happened.  It does not matter, for purposes of the statute, that some of the component acts of the hostile work environment fall outside the statutory time period.").

As the EEOC notes in its amicus brief, Title VII's administrative filing requirement encourages employees and employers to end harassment and resolve their claims without litigation.  See Martinez v. Potter, 347 F.3d 1208, 1211 (10th Cir. 2003) (noting that "[o]ne of the goals of Title VII is to "put an employer on notice of a violation prior to commencement of judicial proceedings . . . .  This in turn serves to facilitate internal resolution of the issue rather than promoting costly and time-consuming litigation.").  Mr. Tademy's approach in this case represents a productive way of dealing with discrimination.  After obtaining his right-to-sue letter, Mr. Tademy reached an agreement with Union Pacific not to exercise his right.  In exchange, a Union Pacific superintendent, Mr. Scott, promised that Union Pacific would conduct additional racial sensitivity training.  In our view, it makes little sense to punish Mr. Tademy for trying to reach a non-litigious solution.  We agree with the EEOC that  "there is no policy justification for penalizing Tademy because he took preliminary steps toward challenging his treatment earlier in the sequence of events comprising the single hostile work

40

environment – thereby giving his employer earlier notice of the problem and an opportunity to correct it without the necessity of litigation." EEOC Br. at 25.

Moreover, Union Pacific is not defenseless if it believes it has been prejudiced by unfair delay. As the Supreme Court noted, employers like Union Pacific may resort to a variety of equitable defenses. Morgan, 536 U.S. at 121 ("In addition to other equitable defenses, therefore, an employer may raise a laches defense, which bars a plaintiff from maintaining a suit if he unreasonably delays in filing a suit and as a result harms the defendant.").

Nevertheless, Union Pacific cites a number of unpublished opinions from various circuits and district courts for the proposition that Mr. Tademy may not "receive a right-to-sue letter, let it expire, file another charge regarding other issues, file suit, and then try to bootstrap in his untimely and waived allegations from his First Charge." Aple's Br. at 32. None of the cases Union Pacific cites are persuasive, much less binding. If anything, Union Pacific's citations are misleading. For example, Union Pacific quotes the following sentence from Druker v. Thomas Jefferson Univ., No. 02-2692, 2005 WL 579741 at *3 (E.D. Pa. Mar. 7, 2005) (unreported): "The right-to-sue letter issued for her second-filed charge does not revive charges included in the first-filed charge, which were not the subject of a timely lawsuit." Read in isolation, this would seem to support Union Pacific's argument.

41

However, the preceding sentence reveals that Ms. Druker's second right to sue letter "[did] not revive charges included in the first," id., because the plaintiff failed to incorporate the charges from the first right-to-sue letter into the second, which focused solely on a new claim, retaliatory termination. Because Ms. Druker had failed to file suit on the basis of the discriminatory acts alleged in the initial charge, any claim relating to the first was waived. Although Union Pacific represents that Druker stands for what might be likened to a "use it or lose it" rule, in fact, the claims from the first charge of discrimination were not revived because Ms. Druker did not attempt to revive them. Druker is inapplicable to this case because, unlike Ms. Druker, Mr. Tademy included the allegations from his first charge in his second.

We therefore conclude that Mr. Tademy may properly raise the allegations of his first EEOC complaint in the instant hostile environment claim.

## B. § 1981

Having determined that summary judgment on Mr. Tademy's Title VII claim was inappropriate, we now consider his § 1981 claim.

"Originally part of § 1 of the Civil Rights Act of 1866, and now codified as § 1981 of Title 42 of the United States Code, this provision guarantee all persons the same right 'to make and enforce contract . . . as enjoyed by white citizens . . . . .'" SAMUEL ESTREICHER & MICHAEL C. HARPER, THE LAW GOVERNING THE EMPLOYMENT RELATIONSHIP 161 (2d ed. 1992) (quoting 42

42

U.S.C. § 1981).  As the district court noted, "[t]he elements of a hostile work environment claim 'under § 1981 are the same as those under Title VII.'"  Aplt's App. vol. IX, at 2085 (quoting Aramburu, 112 F.3d at 1410).  Thus, as in the Title VII context, we must determine whether (1) the acts alleged by Mr. Tademy are part of the same hostile work environment and involve racial animus; (2) the harassment was sufficiently severe to alter the terms, conditions, or privileges of employment; and (3) whether Union Pacific's response to the alleged harassment was inadequate.  See Duncan, 397 F.3d at 1309; Bolden, 43 F.3d at 551; Adler, 144 F.3d at 673-76.

In contrast to Title VII, however, the statute of limitations for a § 1981 claim is a more generous four years.  Jones v. R.R. Donnelley & Sons Co., 541 U.S. 369, 382 (1993) (construing 28 U.S.C. § 1658).  Mr. Tademy filed his complaint on July 21, 2004, and the parties agree that the following alleged acts of harassment occurred within the four-year period preceding that date: the noose incident, the drug tests, the 2002 "slaves'" e-mail, and the "boy" incident. However, the parties disagree as to whether the court may consider alleged acts of harassment occurring before the four-year limitations period.  Accordingly, before we address the merits of Mr. Tademy's claim, we must decide that issue.

1.    **Morgan and § 1981**

In  Morgan, the Supreme Court concluded that "consideration of the entire scope of a [Title VII] racially hostile work environment claim, including behavior

43

alleged outside the statutory time period, is permissible for the purposes of assessing liability, so long as an act contributing to that hostile environment takes place within the statutory time period." 536 U.S. at 105 (emphasis added). The Court based its holding on the principle that "the entire hostile work environment encompasses a single unlawful employment practice" and that "[Title VII] does not separate individual acts that are part of the hostile environment claim from the whole for the purpose of timely filing and liability." Id. at 117-18.

In granting summary judgment to Union Pacific on Mr. Tademy's § 1981 claim, the district court reasoned that the Morgan approach was inapplicable. The court invoked circuit precedent, stating that "[u]nlike Title VII, there is no exception applicable to Section 1981 for considering otherwise untimely claims under the Morgan/Duncan analysis." Aplt's App. vol. IX, at 2084 (citing Harris v. Allstate Ins. Co., 300 F.3d 1183, 1193 n.2 (10th Cir. 2002) and Thomas v. Denny's, Inc., 111 F.3d 1506, 1513-14 (10th Cir. 1997)). Mr. Tademy now argues that these Tenth Circuit decisions are inapplicable to hostile environment claims and that the Morgan rule should apply not only to his Title VII claim but to his § 1981 claim as well. We agree.

In reaching that conclusion, we first note that neither Harris nor Thomas involved hostile environment claims. In Harris, the plaintiff asserted § 1981 claims alleging (a) a racially discriminatory refusal to contract, and (b) a discriminatory referral practice motivated by racial animus and/or a desire to

44

retaliate for alleging racial discrimination. 300 F.3d at 1185. In <u>Thomas</u>, the plaintiff alleged that (a) he had been denied promotions because of his race and because he had previously complained about discrimination, and (b) that his failure to be promoted resulted in his constructive discharge. 111 F.3d at 1505-08. As a result, when this court concluded that the continuing violation theory was inapplicable to the § 1981 claims there at issue; <u>see</u> <u>Harris</u>, 300 F.3d at 1193 n.2; and <u>Thomas</u>, 111 F.3d at 1513-14; it had no occasion to consider an important feature of those particular § 1981 claims that allege a hostile environment: that, as with a Title VII claim based on the same theory, "the entire hostile work environment encompasses a single unlawful employment practice" that "occurs over a series of days or perhaps years" and that the "very nature" of these claims "involves repeated conduct." <u>Morgan</u>, 536 U.S. at 115, 117. In that way, '[h]ostile environment claims are different in kind from discrete acts." <u>Id.</u> at 115. "[I]n direct contrast to discrete acts, a single act of harassment may not be actionable on its own." <u>Id.</u>

By characterizing hostile environment claims in this way, the Supreme Court "essentially rejected" use of the continuing violation doctrine in hostile environment cases and "simplified the law by allowing courts to view allegations of hostile work environment as a single unlawful employment practice." <u>Shields v. Fort James Corp.</u>, 305 F.3d 1280, 1282 (11th Cir. 2002) (internal quotation marks omitted); <u>see</u> <u>also</u> <u>Jensen v. Henderson</u>, 315 F.3d 854, 859 (8th Cir. 2002)

45

(also stating that <u>Morgan</u> "simplified the law by allowing courts to view allegations of hostile work environment as a single unlawful employment practice") (internal quotation marks omitted). Thus, with regard to hostile environment claims the concept of a "continuing violation" that has developed in analyzing claims alleging discrete acts of discrimination is inapposite.

We further note that the Seventh, Eighth, and Eleventh Circuits have all concluded that <u>Morgan</u>'s analysis of the Title VII statute of limitations for hostile environment claims should be applied to § 1981 claims. For example, in <u>Shields</u>, 305 F.3d at 1282-83, the court held that a § 1981 claim alleging that an employer "has allowed a racially hostile work environment to prosper embodies a single violation of an employee's right to 'the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship' and, therefore, should be reviewed in its entirety if any part of this allegation falls within the statute of limitations period." (quoting 42 U.S.C. § 1981)). The Eleventh Circuit reasoned that it had repeatedly held that the same standards of proof and the same analytical framework should be applied to Title VII and § 1981 claims and that "[i]n cases involving a claim of hostile work environment, this symbiosis is especially apt, since Congress specifically amended section 1981, so plaintiffs could bring hostile work environment claims under that statute as well as under Title VII." <u>Id.</u> at 1282; <u>cf. Aramburu</u>, 112 F.3d at 1410 (10th Cir. 1997) (noting that "standards and burdens under § 1981 are the same as those under Title VII") (citation omitted);

46

see also Dandy v. United Parcel Serv., Inc., 388 F.3d 263, 270 (7th Cir. 2004) (stating that "if a plaintiff alleges 'continuing violations,' which constitute a pattern and practice of discrimination, we may look outside of the relevant time period" and that "[t]his doctrine applies to Title VII as well as § 1981 claims"); Madison v. IBP, Inc., 330 F.3d 1051, 1061 (8th Cir. 2003) (holding that Morgan applies to § 1981 claims and reasoning that "[b]ecause § 1981 allows for recovery for the same type of employment discrimination as Title VII, we believe that the distinction between discrete acts and hostile work environment claims should have equal effect on the respective recovery periods for the two statutes").

We are persuaded by the reasoning of these cases. Therefore, following Morgan we hold that "consideration of the entire scope of a [42 U.S.C. § 1981] racially hostile work environment claim, including behavior alleged outside the statutory time period, is permissible for the purposes of assessing liability, so long as an act contributing to that hostile environment takes place within the statutory time period." Morgan, 536 U.S. at 105.

We disagree with Union Pacific that the application of Morgan to § 1981 hostile environment claims will allow "plaintiffs to introduce allegations of time-barred discriminatory acts, without limitation, and potentially recover unlimited damages for an unlimited time period" thereby "subvert[ing] the purpose of the statute of limitations." Aplt's Br. at 51 (emphasis omitted). Under the Morgan rule, a § 1981 plaintiff still faces the formidable hurdle of proving that the alleged

47

acts constitute part of the same hostile environment. Many allegations will not meet this requirement. See, e.g., Duncan, 397 F.3d at 1309 (concluding that "no jury could rationally conclude that the acts [the plaintiff] alleges [were] part of the same hostile environment" because the acts involved different kinds of harassment by different employees and "eighteen years separate the initial allegations from filing period acts"). Additionally, under Morgan, a defendant employer may, in addition to other equitable defenses, "raise a laches defense which bars a plaintiff from maintaining a suit if he unreasonably delays in filing suit and as a result harms the defendant." Morgan, 536 U.S. at 121; see also Pruitt v. City of Chicago, 472 F.3d 920, 928-30 (7th Cir. 2007) (affirming a district court's application of the doctrine of laches to bar Title VII and § 1981 hostile environment claims). In this appeal Union Pacific has not asserted a laches defense, and, as a result, we need not address it here.

**2.    Analysis of Mr. Tademy's § 1981 Claim**

In light of our holding that the Morgan rule applies to § 1981 hostile environment claims, our analysis of Mr. Tademy's § 1981 claim mirrors our analysis of his Title VII claim. Following our discussion of the Title VII claim, we conclude that a jury could rationally find that the following incidents occurring before the four year limitations period were part of the same racially hostile environment: the graffiti that Mr. Tademy discovered on his locker in 1996 and 1997, the racist cartoons posted on company billboards in 1997, the word "nigger"

48

that Mr. Tademy found on the bathroom wall in 1998, Mr. Bleckert's reference to a "F***ing Kunta Kinte," and the "nigger swimming pool" graffiti and "Sambo" cartoon that Mr. Tademy discovered in 2000. A jury could also rationally conclude that these acts of harassment were "sufficiently severe . . . to alter the conditions of [Mr. Tademy's] employment." Harris, 510 U.S. at 21. Finally, following our analysis of Mr. Tademy's Title VII claim, we conclude that a reasonable jury could conclude that Union Pacific failed to "discharge its obligation by taking appropriate remedial or preventive action." Adler, 144 F.3d at 676.

Accordingly, the district court also erred in granting summary judgment to Union Pacific on Mr. Tademy's § 1981 racially hostile environment claim.

### III. CONCLUSION

For the foregoing reasons, we REVERSE the district court's grant of summary judgment with respect to Mr. Tademy's Title VII and 42 U.S.C. § 1981 claims. We REMAND the case for proceedings consistent with this opinion.[3]

---

[3] Mr. Tademy moves to supplement the appendix with deposition testimony referenced in his motion opposing summary judgment, but inadvertently excluded from the record. Although he asserts that "the district court did not notice the omissions in ruling on the case," Motion for Leave to Supplement at 2, we see nothing to indicate that the district court considered the evidence in making its decision. Thus, we cannot conclude that the evidence at issue was part of the record below. Because "our review of a grant of summary judgment is limited to the record before the trial court at the time it made its ruling," Magnum Foods, Inc. v. Continental Cas. Co., 36 F.3d 1491, 1502 n.12 (10th Cir. 1994), we deny the motion.